UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

D. PENGUIN BROTHERS LTD., H.T.A.
EQUITIES, INC., CFH ASSOCIATES, INC.,
AMBASSADOR INVESTORS GROUP, INC.,
RED, WHITE & BLUE PROPERTIES INC.,
64 GREEN STREET LLC, BDLAK EQUITIES, INC.,
SHPITZ EQUITIES INC.,  2000 HOMES INC.,
PETE JACOV, and AVRAHAM GLATTMAN,

|  |  |
|---|---|
| Plaintiffs, | **COMPLAINT** |
| -against- | Dkt. No. 13-Civ.-0041(TPG) |

CITY NATIONAL BANK,
NBUF DEVELOPMENT LTD.,
BLACK UNITED FUND OF NEW YORK, INC.,
FIRST PRO GROUP, INC.,
INNER CITY STRATEGIES,
JAMES ROBERT WILLIAMS a/k/a
J. ROBERT WILLIAMS a/k/a BOB WILLIAMS,
DAVID SPIEGELMAN, ESQ., and
THE CITY OF NEW YORK,

Judge Griesa

**JURY TRIAL
DEMANDED**

Defendants.
------------------------------------------------------------------X

Plaintiffs, by their attorneys, complaining of Defendants, allege as follows:

## PARTIES and ENTERPRISES

### Plaintiffs

1.      Plaintiff D. Penguin Brothers Ltd. ("Penguin") is a business corporation, organized under the laws of the State of New York, with a principal place of business in the County of Queens, State of New York.

2.      Penguin is in the business of purchasing, owning, developing, managing, and selling real property in low and middle income communities in and around the New York City metropolitan area.   Penguin is a "person" within the meaning of 18 U.S.C. § 1961(3).

3.      Plaintiff H.T.A. Equities, Inc. ("HTA") is a business corporation, organized and dissolved under the laws of the State of New York, with a principal place of business in the County of Nassau, State of New York.

4.      HTA was in the business of purchasing, owning, developing, managing, and selling real property in low and middle income communities in and around the New York City metropolitan area. HTA is a "person" within the meaning of 18 U.S.C. § 1961(3).

5.      Plaintiff CFH Associates, Inc. ("CFH") is a business corporation, organized and dissolved under the laws of the State of New York, with a principal place of business in the County of Nassau, State of New York.

6.      CFH was in the business of purchasing, owning, developing, managing, and selling real property in low and middle income communities in and around the New York City metropolitan area. CFH is a "person" within the meaning of 18 U.S.C. § 1961(3).

7.      Plaintiff Ambassador Investors Group Inc. ("Ambassador") is a business corporation, organized and existing under the laws of the State of New York, with a principal place of business in the County of Queens, State of New York.

8.      Ambassador is in the business of purchasing, owning, developing, managing and selling real property in low and middle income communities in and around the New York City metropolitan area.  Ambassador is a "person" within the meaning of 18 U.S.C. § 1961(3).

9.      Plaintiff Red, White & Blue Properties Inc. ("RWB") is a business corporation, organized and existing under the laws of the State of New York, with a principal place of business in the County of Queens, State of New York.

10.     RWB is in the business of purchasing, owning, developing, managing and selling real property in low and middle income communities in and around the New York City metropolitan area.  RWB is a "person" within the meaning of 18 U.S.C. § 1961(3).

11.     Plaintiff 64 Green Street LLC ("64") is a limited liability company, organized and existing under the laws of the State of New York, with a principal place of business in the County of Queens, State of New York.

12.     64 is in the business of purchasing, owning, developing, managing and selling real property in low and middle income communities in and around the New York City metropolitan area. 64 is a "person" within the meaning of 18 U.S.C. § 1961(3).

13.     Plaintiff Bdlak Equities, Inc. ("Bdlak") is a business corporation, organized and existing under the laws of the State of New York, with a principal place of business in the County of Nassau, State of New York.

14.     Bdlak is in the business of purchasing, owning, developing, managing and selling real property in low and middle income communities in and around the New York City metropolitan area. Bdlak is a "person" within the meaning of 18 U.S.C. § 1961(3).

15.     Plaintiff Shpitz Equities Inc. ("Shpitz") is a business corporation, organized and existing under the laws of the State of New York, with a principal place of business in the County of Nassau, State of New York.

16.     Shpitz is in the business of purchasing, owning, developing, managing and selling real property in low and middle income communities in and around the New York City metropolitan area. Shpitz is a "person" within the meaning of 18 U.S.C. § 1961(3).

17.     Plaintiff 2000 Homes Inc. ("2000") is a business corporation, organized and existing under the laws of the State of New York, with a principal place of business in the County of Queens, State of New York.

18.     2000 is in the business of purchasing, owning, developing, managing and selling real property in low and middle income communities in and around the New York City metropolitan area. 2000 is a "person" within the meaning of 18 U.S.C. § 1961(3).

19.     Plaintiff Pete Jacov ("Jacov") is a natural person, residing in the County of Westchester, State of New York. Jacov is a 50% shareholder and officer of Penguin, HTA, CFH, RWB, 64, Ambassador, Bdlak, Shpitz, and 2000. Jacov is a "person" within the meaning of 18 U.S.C. § 1961(3).

20.     Plaintiff Avraham Glattman ("Glattman") is a natural person, residing in the County of Nassau, State of New York. Glattman is a 50% shareholder and an officer of Penguin, HTA, CFH, RWB, 64, Ambassador, Bdlak, Shpitz, and 2000. Glattman is a "person" within the meaning of 18 U.S.C. § 1961(3).

### Enterprises

21.     National Black United Fund, Inc. a/k/a NBUF ("NBUF") was organized and exists, under the laws of the State of New York, as a not-for-profit corporation, with a registered principal place of business in the County of New York, State of New York. Upon information and belief, NBUF maintains administrative offices at 40 Clinton Street, Newark, New Jersey 07102.

22. NBUF purports to raise money for organizations which serve the "Black American community" through "self help."

23. Through the instrumentalities of interstate commerce, among them an internet website at WWW.NBUF.ORG ("NBUF Website"), NBUF promotes itself and its "affiliates", and engages in other activities which affect interstate commerce, including the solicitation of monetary contributions by credit card.

24. NBUF is a "person" within the meaning of 18 U.S.C. § 1961(3), and an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

25. At times relevant to the events alleged in this Complaint, an unincorporated association (the "Association") was formed by, and existed among, Defendants City National Bank, James Robert Williams a/k/a J. Robert Williams a/k/a Bob Williams, David Spiegelman, NBUF Development, Inc., Black United Fund of New York, Inc., First Pro Group, Inc., and Inner City Strategies (collectively, the "RICO Defendants"), all of whom participated in and furthered its operations.

26. The purpose of the Association was to perpetrate the thefts and related crimes described in this Complaint, and to use the proceeds of those thefts to purchase the favor and influence of political leaders and government officials for the benefit of Defendants and of NBUF.

27. The Association is a "person" within the meaning of 18 U.S.C. § 1961(3), and an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

### Defendants

28. Defendant City National Bank of New Jersey ("CNB") is a federally chartered commercial bank, a member of the Federal Deposit Insurance Corporation, and a subsidiary of

City National Bancshares Corp. Upon information and belief, CNB maintains its headquarters in Newark, New Jersey, and operates banking branches in both New Jersey and New York.

29.     CNB maintains an internet website, WWW.CITYNATBANK.COM, on which it promotes itself as a "minority owned and managed bank" with a "mission to build economic strength and improve the quality of life within the communities we serve." On the website, CNB further advertises its "support for socially conscious" urban development projects in New York and New Jersey through the City Nation Urban Fund, an entity created by CNB.

30.     CNB is a "person" within the meaning of 18 U.S.C. § 1961(3)

31.     Defendant James Robert Williams a/k/a J. Robert Williams a/k/a Bob Williams ("Williams") is identified on the NBUF Website as the Chairman of NBUF's Board of Directors, unanimously elected to that position in March 2009 after long association NBUF. Williams resides in the County of Queens, State of New York.

32.     As alleged herein, prior to his election as Chairman, Williams represented to Plaintiffs that he served as NBUF's Director of Strategic Development.

33.     Williams is a "person" within the meaning of 18 U.S.C. § 1961(3).

34.     On the NBUF Website, NBUF identifies Chairman Williams as the "co-founder" of Defendant Inner City Strategies ("ICS"), and promotes ICS as "one of the largest faith organizations in the United States, with membership of over 250 churches in the Northeast."

35.     Notwithstanding these plaudits, ICS is not listed among qualified charitable organizations on the Internal Revenue Service's website, WWW.IRS.GOV, and the only internet reference to ICS uncovered by searches conducted through the Google, Yahoo, and Bing search engines is the one which appears on the NBUF Website.

36.     Based on the foregoing, ICS is believed to be an unincorporated association, and a "person" within the meaning of 18 U.S.C. § 1961(3).

37.     Defendant Black United Fund of New York, Inc. ("BUFNY") is organized as a not-for-profit corporation under the laws of the State of New York, with a registered principal place of business in the County of New York, State of New York.

38.     The NBUF Website lists BUFNY as one of NBUF's affiliates, with the same Newark, New Jersey address listed for NBUF.

39.     As alleged herein, at times relevant to the claims asserted, Williams represented to Plaintiffs that he served as Chairman of BUFNY's Board of Directors.

40.     Defendant NBUF Development Ltd. ("NBUF Development") is a business corporation, organized and later dissolved under the laws of the State of New York, with a registered principal place of business in the County of Queens, State of New York.

41.     Upon information and belief, defendant NBUF Development is a subsidiary of NBUF and was authorized by NBUF to incorporate the initials, "NBUF", an abbreviation for National Black United Fund, in its name.

42.     NBUF Development is a "person" within the meaning of 18 U.S.C. § 1961(3).

43.     Defendant First Pro Group, Inc. ("First Pro") is a business corporation, organized and later dissolved under the laws of the State of New York, with a registered principal place of business in the County of Queens, State of New York.

44.     First Pro is a "person" within the meaning of 18 U.S.C. § 1961(3).

45.     Defendant David Spiegelman, Esq. ("Spiegelman") is an attorney, admitted to the practice of law in the State of New York.

46.     At all times relevant to the claims herein, Spiegelman was retained by Plaintiffs Jacov and Glattman to represent and protect their interests, as well as the interests of Plaintiffs Penguin, HTA, CFH, Ambassador, RWB, 64, Bdlak, Shpitz and 2000, and other businesses owned by Jacov and Glattman.

47.     Spiegelman is a "person" within the meaning of 18 U.S.C. § 1961(3).

48.     Defendant City of New York ("NYC") is a municipal corporation, organized and existing under the laws of the State of New York.

## JURISDICTION AND VENUE

49.     Plaintiffs allege claims against all of the RICO Defendants under the Racket Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. This Court has subject matter jurisdiction of Plaintiffs' RICO claims pursuant to 18 U.S.C. § 1964, and also pursuant to 28 U.S.C. § 1331.

50.     This Court has subject matter jurisdiction over Plaintiffs' state law claims, as part of the same case or controversy underlying Plaintiffs' RICO claims, pursuant to 28 U.S.C. § 1367.

51.     Venue is proper in this District pursuant to 18 U.S.C. § 1965, since several of the Defendants reside, are found, have agents, or transact affairs in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1391(b), since a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

52.     This Court has personal jurisdiction over each of the RICO Defendants under 18 U.S.C. § 1965.

53.     This Court also has personal jurisdiction over Defendants CNB, Williams, NBUF Development, BUFNY, NYCHA and NYC under N.Y. C.P.L.R. § 301, as each of these

Defendants resides in New York, by reason either of incorporation in New York or, upon information and belief, or by conducting activities within New York which are sufficiently substantial and regular to create a presence in the State.

54.     This Court also has personal jurisdiction over all RICO Defendants under N.Y. C.P.L.R. § 302, as the claims against each Defendant arise from tortious acts committed by the Defendant, in person or through an agent: (a) in New York; and/or (b) outside of New York, while the Defendant derived substantial revenue from interstate commerce and may reasonably have expected its alleged acts to have consequences in New York.

## OVERVIEW OF PLAINTIFFS' CLAIMS IN THIS COMPLAINT

55.     Plaintiffs are the victims of thefts (the "Thefts", described in paragraphs 183 through 203 herein), totaling some $6,700,000.00, committed through frauds over a period of approximately six years. With the addition of consequential losses, Plaintiffs' direct injuries from the Thefts, through the date of this Complaint, well exceed $11,000,000.00, and are continuing to mount.

56.     Upon information and belief, each of the RICO Defendants conspired in the commission of some or all of the Thefts, and each of the RICO Defendants either committed or aided and abetted the commission of some or all of the Thefts.

57.     The RICO Defendants gained access to the bulk of the money stolen from Plaintiffs by inducing them to deposit. or to leave on deposit, some $4,500,000.00 dollars (the "Escrowed Funds") in escrow accounts, maintained by Plaintiffs' trusted attorney, Defendant Spiegelman, for the declared purpose of funding joint ventures and/or partnerships, allegedly

managed by Defendant Williams, which would purchase financially troubled "Section 8"[1] housing properties in the City of New York (the "Section 8 Deals") and make other investments in real estate (the "Development Deals") in the New York metropolitan area, sponsored by the Department of Housing and Urban Development ("HUD") or by municipal agencies. Each of the Section 8 Deals and Development Deals proposed by Defendants turned out to be wholly or partially fictive.

58.    For the purpose of inducing Plaintiffs to turn the Escrowed Funds over to Spiegelman, and to allow Spiegelman to retain their possession, Williams or Spiegelman or both of them represented to Plaintiffs that: (i) Williams and NBUF enjoyed special influence with HUD,  the New York City Housing Authority ("NYCHA"), the New York City Department of Housing Preservation and Development ("NYCHPD") and other government agencies, which could be wielded to facilitate required approvals of the Section 8 Deals and the Development Deals; (ii) maintenance of the Escrowed Funds in Spiegelman's attorney trust accounts was essential to demonstrate to these agencies that Plaintiffs possessed sufficient, liquid financial capacity to meet the obligations which the Section 8 Deals and Development Deals would impose; (iii) as a condition to NBUF's "backing" of the solicited  acquisitions of the subject properties, NBUF required that the bulk of the Escrowed Funds be deposited with Defendant CNB, a minority-owned bank with which NBUF had close ties; and (iv) none of the Escrowed Funds would be withdrawn without the specific approval of Plaintiffs Jacov and Glattman.

59.    In reliance on these representations and others, and on the presumed fidelity of Spiegelman, their attorney, Plaintiffs provided the Escrowed Funds, and agreed that some

---

[1] Rent-subsidized housing operated under Section 8 of the United States Housing Act of 1983, as amended.

$3,000,000.00 of the Escrowed Funds would be held by Spiegelman in an attorney trust account he opened with CNB for this purpose.

60.     Between early 2005 and late 2010 or early 2011, without Plaintiffs' knowledge, Williams and Spiegelman stole all of the Escrowed Funds through interbank wire transfers, intrabank funds transfers at CNB, the Federal Reserve check clearance system, and other instrumentalities and facilities of interstate commerce.

61.     Throughout this period, Williams and Spiegelman perpetuated control and theft of the Escrowed Funds through, among other devices, forgery of transactional documents designed to convince Plaintiffs that some of the Section 8 Deals had been, or were in the process of being, consummated. Upon information and belief, the forgeries included purported "approvals" of real estate purchase contracts by New York's Inspector General, a purported "memorandum" from the New York City Department of Finance, and the purported signatures of high-ranking New York City officials, among them Commissioners of NYCHA and Corporation Counsel, on various deeds and contracts.

62.     On top of the Escrowed Funds, Williams and Spiegelman stole another approximately $2,200,000.00 from Plaintiffs, comprising: (i) other funds entrusted to Spiegelman in escrow for purposes unrelated to the Section 8 Deals or the Development Deals; and (ii) the proceeds of unauthorized loans, taken by Spiegelman through forgery, in the names of some of the Plaintiffs and, in several instances, secured with mortgages on real property owned by some of the Plaintiffs.

63.     Upon information and belief, the RICO Defendants used much of the money stolen from Plaintiffs to purchase the favor and influence of government officials, for the benefit

of NBUF and its affiliates, through monetary contributions to election campaigns of politicians and to political action committees, and possibly also direct payments to government officials.

64. As alleged in this Complaint, in committing the Thefts, each of the RICO Defendants participated in conducting the affairs of NBUF or of the Association or of both through a "pattern of racketeering activity," as that term is defined by 18 U.S.C. § 1961(1), which encompassed, at a minimum, multiple acts of mail fraud (18 U.S.C. § 1343), wire fraud (18 U.S.C. § 1344), money laundering (18 U.S.C. §§ 1956, 1957), and interstate transportation of stolen money (18 U.S.C. § 2314), resulting in injuries to the properties and businesses of Plaintiffs.

## FACTS

### The Set-Up: The Deal for the Ennis Francis Houses

65. In or around November 2004, Defendant Spieglman introduced Plaintiffs Jacov and Glattman to Defendant Williams, who described himself to them as: (i) the Director of Strategic Development for NBUF, and the "one who runs everything at NBUF"; (ii) Chairman of the Board of Directors of Defendant BUFNY, an NBUF affiliate; and (iii) a "political activist and lobbyist", working to obtain the support of political leaders and government officials, both elected and appointed, for programs and causes promoted by NBUF and BUFNY.

66. In late 2004 and early 2005, in a number of in-person meetings at Plaintiffs' offices at 214-61 Jamaica Avenue, Queens Village, New York, and in telephone conferences, between Williams and Jacov or Glattman or both of them, Williams purported to offer Jacov and Glattman the opportunity to "get in on deals" to purchase, at attractive prices, Section 8 housing developments in minority neighborhoods of the City of New York which, due to current owners'

mismanagement or lack of financial capacity, had become dilapidated or insolvent, or were otherwise failing to meet the needs of their tenants.

67. Williams also explained to Jacov and Glattman that, in furtherance of NBUF's mission to improve the quality of life in African-American communities, NBUF was working with HUD, NYCHA and NYCHPD to find qualified purchasers for these "troubled" Section 8 housing developments and that he, Williams, was the "point man" for NBUF on this project.

68. In these discussions, Williams further represented that, with NBUF's backing and the influence he enjoyed with involved federal and municipal officials, he could facilitate the process of obtaining required approvals from HUD, NYCHA and NYCHPD for the Section 8 Deals. Williams buttressed these claims with tales of personal relations and frequent contact with well-known and highly placed officials, among them New York City Mayor Michael Bloomberg, New York U.S. Senator Charles E. Schumer, then Secretary of Housing and Urban Development Alphonso Jackson, New York U.S. Representative Charles Rangel, then New York State Attorney General Andrew Cuomo, then New York City Deputy Mayor Kevin Sheeky, New York City Councilman Peter F. Vallone, Jr., and then NYCHA Deputy Chairman (later, Chairman) Earl Andrews, Jr.

69. In or around early April 2005, Williams "offered" Jacov and Glattman the first of the Section 8 Deals – the "opportunity" to enter into a partnership to purchase (the "EFHA Purchase") the interests of the general and limited partners of the Ennis Francis Housing Associates, L.P. ("EFHA LP"), a limited partnership which owned and managed a large Section 8 housing complex in Manhattan, known as the Ennis Francis Houses.

70. To induce Jacov and Glattman to invest in the EFHA Purchase, Williams represented to them that he was the managing member of a limited liability company known as

Meridian Real Estate Management and Development Associates, L.L.C. ("Meridian LLC") which, with NBUF's backing, had already entered into a contract (the "EFHA Contract") to purchase the interests of the EFHA LP general partners, and further that the EFHA Contract and the EFHA Purchase had already received preliminary approvals from HUD, NYCHA and NYCHPD.

71.     In support of this investment proposal, in April 2005 Williams faxed Plaintiffs copies of two documents he claimed constituted the EFHA Contract, one headed "Agreement", dated November 24, 2004, and one headed "Amended and Restated Agreement", bearing an execution date of February 22, 2005.

72.     Williams also explained to Jacov and Glattman that the EFHA Purchase would be financed, in part, by Meridian LLC's two other members, Paul Jaikaran ("Jaikaran") and Cheron Ramphal ("Ramphal"), through a general partnership known as Meridian Partners, but that Meridian LLC required additional funds.

73.     Specifically, Williams advised that the final approvals of HUD, NYCHA and NYCHPD of the EFHA Purchase required Jacov and Glattman, as investors, to demonstrate financial capacity sufficient for Meridian LLC both to consummate the EFHA Purchase, and to renovate and operate the Ennis Francis Houses thereafter.

74.     Additionally, according to Williams, Meridian LLC was then short on cash and needed $125,000.00 immediately to meet expenses which had already been incurred or would soon be incurred in obtaining final approvals of the EFHA Purchase.

75.     After meetings at Jacov's and Glattman's offices, arranged by Williams and Spiegelman by telephone, and attended by Williams, Spiegelman, Jaikaran, Ramphal, Jacov, and Glattman, an agreement in principle was reached in early or mid-April 2005 under which Jacov

and Glattman would receive a 50% interest in an as yet unformed limited liability partnership with Meridian LLC and Meridian Partners, in exchange for Jacov's and Glattman's commitment to invest up to $10,000,000.00 over time, to be used for the EFHA Purchase, and the subsequent renovation and operation of the Ennis Francis Houses.

76.     The points of agreed principle were set forth in two letters of intent, dated April 12, 2005 and April 14, 2005 (the "EFH Letters of Intent"), drafted jointly by Spiegelman and Williams in early to mid-April 2005 in a series of facsimile transmissions between them.

77.     The EFH Letters of Intent were followed shortly in mid-April 2005 by a written agreement, entitled "Commitment Agreement, by and between Meridian LLC and Meridian Partners with Pete Jacov and Avraham Glattman" (the "EFH Commitment Agreement"), again jointly drafted by Spiegelman and Williams in a series of facsimile transmissions between them.

78.     Williams, Jaikaran, Ramphal, Jacov and Glattman executed the EFH Commitment Agreement on April 18, 2005. Their signatures were acknowledged by Spiegelman, as notary.

79.     Although not known to Jacov or Glattman at the time, upon information and belief, Meridian LLC was never a limited liability company or any other entity with independent juridical existence, and Williams was never the managing member of such a limited liability company.

80.     Upon information and belief, when Williams represented that Meridian LLC was a limited liability company and that he was its managing member, Williams knew these representations were false.

81.     Pursuant to the EFH Commitment Agreement, on April 22, 2005, Williams faxed Spiegelman instructions for Jacov and Glattman to issue checks, which Williams represented

would be used to pay alleged disbursements of Meridian LLC in furtherance of the EFHA Purchase.

82.     In reliance on the representations made by Williams, as alleged in ¶¶ 65-81 herein, and as instructed by Williams and Spiegelman, Jacov and Glattman caused checks totaling $125,000.00 to be drawn on HTA's checking account and delivered to Williams. These included a $60,000.00 check to Defendant First Pro, which Williams represented would be used to pay expenses for the "coordination of public relations services and lobby efforts and advocacy plans" necessary to obtain final approvals of the EFHA Purchase.

83.     Upon information and belief, the $60,000.00 disbursed to First Pro were not used to pay any expenses incurred to secure HUD approval of the EFHA Purchase, as Williams had represented, but were misappropriated by Williams for purposes unrelated to the EFHA Purchase.

84.     Upon information and belief, at the time Williams represented the $60,000.00 disbursement to First Pro would be used to pay expenses incurred to secure HUD approval, Williams knew this was not true, and intended that the funds would not be used for any purpose related to the EFHA Purchase.

85.     At Williams' further request, in or around mid-April 2005, Jacov and Glattman provided him with financial statements and other documentation of their financial and real estate holdings which, Williams represented, would be used to demonstrate to HUD and the other involved agencies that, with their investment commitment, Meridian LLC now possessed sufficient financial capacity to consummate the EFHA Purchase and thereafter renovate and operate the Ennis Francis Houses.

86.     Upon information and belief, Williams' representation that the documentation of Jacov's and Glattman's financial and real estate holdings would be used to demonstrate financial capacity to HUD was false, and was known by Williams to be false when made; Williams neither used the documentation for the represented purpose nor ever intended it to be so used.

87.     Upon information and belief, Williams' purpose in requesting documentation of Jacov's and Glattman's financial and real estate holdings was instead to learn the extent and nature of their financial resources for the purpose of facilitating the Thefts.

88.     In further meetings and telephone conferences in April and May 2005, Williams advised Jacov and Glattman that HUD and the other involved agencies required, as a condition to their approvals of the EFHA Purchase, that they maintain, in one or more attorney escrow accounts, bank deposits of at least $5,500,000.00, "pledged" for use in the EFHA Purchase and the subsequent operation of the Ennis Francis Houses.

89.     Upon information and belief, Williams' representations that approvals of the EFHA Purchase required Jacov and Glattman to maintain attorney escrow deposits of $5,500,000.00 so "pledged" were false, and were known by Williams to be false when made; Williams made these representations to deceive Jacov and Glattman into believing that consummation of the EFHA Purchase required maintenance of the "pledged" deposits, and to induce them to assemble the subject funds in bank accounts to which the RICO Defendants could gain access.

90.     Williams also advised that, as a condition to NBUF's backing of the EFHA Purchase, NBUF insisted that the bulk of the "pledged" attorney escrow account deposits be maintained with CNB, a minority-owned bank with close ties to Williams and NBUF.

91.   Upon information and belief, Williams' representation that NBUF insisted that the bulk of the "pledged" deposits be maintained with CNB was false, and was known by Williams to be false when made.

92.   Jacov and Glattman consented to maintain the "pledged" bank deposits, including deposits with CNB of approximately $3,000,000.00, subject to the specific conditions, to which Williams agreed, that: (i) Spiegelman hold the "pledged" bank deposits in attorney escrow accounts in his name; and (ii) no disbursements of any of the "pledged" funds be made without Jacov's and Glattman's approval.

93.   In reasonable reliance on this agreement, on Williams' representations, and on Spiegelman's presumed fidelity as Plaintiffs' attorney, Plaintiffs provided the "pledged" funds, to be held by Spiegelman in escrow, comprising: (i) some $1,000,000.00 then held in an Interest on Lawyer's Account ("IOLA") maintained by Spiegelman at HSBC Bank (the "HSBC IOLA"); (ii) the proceeds of loans, totaling $3,000,000.00, taken by CFH on May 10, 2005 and June 27, 2005, secured by mortgages on real estate CFH owned at 172 Avenue B, New York, New York (the "CFH Mortgage Loans"); and (iii) additional funds of approximately $1,500,000.00, contributed by Glattman (the "Glattman Funds") on or about July 31, 2008.

94.   The requirement of specific approval by Jacov and Glattman of disbursements of any of the "pledged" funds was subsequently confirmed in a memorandum, drafted by Spiegelman, signed by Williams, and then faxed by Williams back to Spiegelman on July 21, 2005. As concerned disbursement of the pledged funds, the memorandum stated in relevant part:

> Any disbursements of any funds either held in escrow, in CD's or other financial
>
> instruments, and any of the funds necessary to effectuate the purposes of this
>
> venture [i.e., the EFHA Purchase] or other venture proposed under the direction

of J. Robert Williams, shall be made after demand by the Managing Partner and approval by Ray Glattman and Pete Jacov.

95.     Upon information and belief, when Williams signed and returned the July 21, 2005 memorandum, and when Spiegelman drafted it, Williams and Spiegelman never intended to seek the approvals of Glattman and Jacov for withdrawals of the "pledged" funds, but instead both intended to misappropriate these funds.

96.     On May 13, 2005, Spiegelman opened IOLA no. ▓▓▓▓▓▓ at CNB's branch at 382 West 125th Street, in Harlem, New York (the "CNB IOLA"), for the purpose of holding in escrow a portion of the funds "pledged" by Plaintiffs for the EFHA Purchase.

97.     Between May 13, 2005 and September 28, 2005, Plaintiffs directed Spiegelman to make the following deposits of the proceeds of the CFH Mortgage Loans in the CNB IOLA: (i) on 5/13/05 a check of $704,000.00; (ii) on 5/16/05 a wire transfer of $600,000.00; (iii) on 6/28/05 a wire transfer of $1,339,124.9; and (iv) on 9/28/05 a wire transfer of $111,846.00..

98.     Deeds recorded with the New York City Register reveal that the following conveyances (the "EFH Conveyances") of the real property, with improvements and fixtures, comprising the Ennis Francis Houses, were made for nominal consideration on May 16, 2005: (i) from EFHA LP to HUD; (ii) from HUD to NYCHDC Real Estate Development, Corp., believed to be a not-for-profit entity operating as an agency of the City of New York; and (ii) from NYCHDC Real Estate Development Corp. to ADC/Ennis Francis Housing Fund Development, Inc., believed to be a private not-for-profit corporation, which has since continued to own the EFH Properties.

99.     The EFH Conveyances defeated the purported purpose of the EFHA Purchase.

100.    Upon information and belief, before CFH took the CFH Mortgage Loans, and before any "pledged" funds were deposited in the CNB IOLA, and perhaps even before the negotiation and execution of the EFHA Commitment Agreement, Williams and Spiegelman knew that HUD had already approved proposals for the EFH Conveyances, and was not considering approval of the EFHA Purchase by Meridian LLC or by any other entity with which Williams was involved, but deliberately withheld this information from Plaintiffs.

101.    On or about October 31, 2005, at a meeting at Plaintiffs' offices, Williams first advised Jacov and Glattman of the EFH Conveyances, explaining only that Meridian LLC had been "outbid" by the entity which acquired ownership of the EFH properties. Williams also asserted to Jacov and Glattman that they should not be concerned over the demise of the EFHA Purchase because he would shortly present them with better Section 8 Deals.

102.    Upon information and belief, Williams' explanation that Meridian had been "outbid" was false, and was known by Williams to be false when made.

<u>Noble Drew Properties</u>

103.    At or about the time Williams advised Jacov and Glattman of the EFHA Conveyances, he proposed another of the Section 8 Deals -- the "opportunity" to form a partnership with him to purchase Section 8 housing developments in the Ocean Hill-Brownsville neighborhood in Brooklyn known as Noble Drew Ali Plaza and William L. Chisolm HDFC properties (collectively, "Noble Drew"), owned and operated by entities which were, in turn, owned by Abdur Rahman Farrakhan f/k/a William H. Chisolm ("Farrakhan").

104.    In or about early December 2005, Williams and Spiegelman advised Jacov and Glattman they had negotiated terms of an agreement to purchase Farrakhan's interests in the entity which owned Noble Drew for $4,500,000 (the "Noble Drew Purchase"), this price

dependent upon tax debt forgiveness and other government incentives, and, further, that they had obtained all required approvals for the Noble Drew Purchase from NYCHPD, NYCHA, HUD, New York City's Corporation Counsel, and "other state and federal agencies."

105.    Upon information and belief, these representations by Williams and Spiegelman were false in that no agreement had been reached with respect to the purchase of Farrakhan's interest in Noble Drew, and the purported purchase had not been approved by NYCHPD, NYCHA, HUD, New York City's Corporation Counsel, or any other state or federal agency.

106.    As he had in connection with the EFHA Purchase, Williams represented to Jacov and Glattman that the government agencies involved required demonstration of substantial financial capacity to consummate the Noble Drew Purchase, including continued maintenance of $4,500,000.00 in "pledged" bank deposits in Spiegelman's escrow accounts.

107.    In reliance on these representations, Jacov and Glattman agreed that Spiegelman would continue to hold a minimum of $4,500,000.00 of "pledged" deposits in the CNB IOLA, the HSBC IOLA, and in another lawyer's escrow account Spiegelman maintained at Esquire Bank, to be applied to the Noble Drew Purchase.

108.    Through 2006, in both in-person meetings and telephone calls with Jacov or Glattman or both of them, Williams and Spiegelman represented that they were "working" with HUD and involved municipal agencies to resolve various issues surrounding the Noble Drew Purchase, had met with HUD Secretary Alphonso Jackson and New York City Deputy Mayor Kevin Sheeky , and that their efforts aimed at such purposes were ultimately successful.  Among other successful efforts claimed by Williams and Spiegelman were the removal of deed restrictions and releases of tax liens in connection with Noble Drew.

109.    In fact, Spiegelman had never attended meetings about Noble Drew with HUD Secretary Jackson or Deputy Mayor Sheeky and, upon information and belief, neither had Williams.

110.    Further, Williams' and Spiegelman's representations that they had obtained approvals of removal of deed restrictions and releases of tax liens in connection with Noble Drew were upon information and belief, false, and were known to be false when made.

111.    After these initial, claimed "successes", Williams and Spiegelman reported to Jacov and Glattman that the Noble Drew Purchase would be delayed due to "legal problems" encountered by Farrakhan or the entities he owned.

112.    Williams and Spiegelman continued to report these delays until in or around early 2007 when they advised Jacov and Glattman that Farrakhan had stopped "cooperating" with them, and that the deal for the Noble Drew Purchase was now "dead."

### Hempstead Redevelopment Project/The General Partnership

113.    In or around late winter or early spring of 2007, Williams proposed to Jacov and Glattman that, in place of their *ad hoc* agreements for specific real estate ventures, they enter into a general partnership with him and numerous entities he claimed to own and/or operate, including "NBUFD Inc.", "Inner City Strategies", "First Pro Group", "Urban Developers, Inc.", "Empire Redevelopment Inc.", "Meridian Group", "Meridian Real Estate Management and Development Associates, L.L.C." and "Meridian Partners", for the purposes of purchasing, developing and managing real estate.

114.    Williams advised that he and the named entities were then pursuing a number of Development Deals, including an "urban redevelopment" project (the "Hempstead Redevelopment Project") for the private acquisition and commercial/retail development of real

estate in the Village of Hempstead, New York, bounded by Union Place on the north, Franklin Avenue on the west, West Columbia Street on the south, and Main Street on the east (the "Redevelopment Area").

115. In or around May or June 2007, Williams and Spiegelman provided Jacov with what appeared to be a draft of an agreement, dated May, 2007, titled "ASSIGNMENT AND MODIFICATION AGREEMENT by and among INCORPORTED VILLAGE OF HEMPSTEAD, INCORPORATED VILLAGE OF HEMPSTEAD COMMUNITY DEVELOPMENT AGENCY, RB HEMPSTEAD LLC and URBANAMERICA, LP" (the "Draft Agreement") providing, among other things, that  UrbanAmerica, LP's take over, from RB Hempstead LLC, of the role of developer in the Hempstead Redevelopment Project.

116. During this period, Williams explained to Jacov and Glattman, in in-person meetings at Jacov's and Glattman's offices, and in telephone conversations, that UrbanAmerica, L.P. was then in negotiation with the other parties to the Draft Agreement to take over the Hempstead Redevelopment Project from RB Hempstead LLC, then under contract as developer.

117. Williams further represented to Jacov and Glattman that, for "political reasons," UrbanAmerica, L.P. wanted the backing of NBUF and its "presence" in the Hempstead Redevelopment Project and, further, that Williams had "worked a deal with" UrbanAmerica, L.P. to arrange for NBUF's backing and "presence" in exchange for the opportunity to participate in and to invest up to $7,000,000.00 in the Hempstead Redevelopment Project, as a co-developer, through an entity to be formed.

118. From in or about the spring of 2007 through the end of October, 2007, in a series of in-person meetings at Jacov's and Glattman's offices, attended by Williams, Spiegelman,

Jacov and Glattman, and in telephone conferences between Williams and Jacov or Glattman or both of them, Williams, Jacov and Glattman reached an agreement on terms for the Partnership.

119.   The agreed terms for the Partnership were memorialized in a document (the "General Partnership Agreement"), dated November 1, 2007, captioned "GENERAL PARNERHIP AGREEMENT BETWEEN AVRAHAM GLATTMAN (Partner) & PETE JACOV (Partner) & J. ROBERT WILLIAMS (partner) SO AGREED UPON AND MERGED INTO THE EXISTING ENTITIES OF NBUFD INC., INNER CITY STRATEGIES, FIRST PRO GROUP, URBAN DEVELOPERS, INC., EMPIRE REDEVELOPMENT INC., MERIDIAN GROUP, MERIDIAN LLC, MERIDIAN PARTNERS, AND ANY AND ALL OTHER ENTITIES SO INCORPORATED BY OR FOR THE BENEFIT OF J. ROBERT WILLIAMS, AND OTHERWISE, OWNED AND OEPRATED BY J. ROBERT WILLIAMS" (capitalized in original).

120.   Upon information and belief, Williams and Spiegelman together drafted the General Partnership Agreement in a series of facsimile transmissions between them in late October 2007.

121.   Williams, Jacov and Glattman executed the General Partnership Agreement, and Spiegelman acknowledged their signatures, as notary, on or about November 1, 2007.

122.   The General Partnership Agreement provided that Williams would be the Partnership's Managing General Partner, with a 15% interest in its distributions, income, gains and losses, and that Jacov and Glattman would each be a General Partner, each with a 42.5% interest in the Partnership's distributions, income, gains and losses. The General Partnership Agreement further provided, among other things: (i) the purpose of the Partnership was "to engage in the business of REAL ESTATE DEVELOPMENT, ACQUISITION, DIVESTURE &

REHABILITATION, AND ANY AND ALL SUBSEQUENT ACTIVITIES SO APPROVED BY THE PARTNERSHIP" (capitalized and underlined in original); (ii) Jacov and Glattman would contribute "UP TO $7,000,000.00 to the capital of the Partnership" (capitalized in original); and (iii) expenditures by the Partnership in excess of $500.00 would "require the consent of two thirds [66%] of the General Partners" (brackets in original).

123.    Upon information and belief, Williams' representations to Jacov and Glattman that NBUFD Inc., Empire Redevelopment, Inc., Meridian Group, and Meridian LLC existed and were carrying on business activities in connection with real estate were false, and were known by Williams and Spiegelman to be false when made.

124.    Upon information and belief, Williams' representations to Jacov and Glattman that he had "worked a deal with" UrbanAmerica, L.P. to participate in and invest up to $7,000,000.00 in the Hempstead Redevelopment Project, as a co-developer, were false, and were known by Williams and Spiegelman to be false when made.

125.    Upon information and belief, Williams' representations to Jacov and Glattman that he owned and operated Urban Developers, Inc. were false, and were known by Williams to be false when made.

126.    Upon information and belief, when Williams urged Jacov and Glattman to enter into the Partnership, and when Williams, Jacov and Glattman executed the General Partnership Agreement, neither Williams nor Spiegelman intended that the Partnership would ever engage in business activities connected with the Hempstead Redevelopment Plan or with the development, acquisition, divestiture or rehabilitation of any other real estate, or that it would ever carry on any gainful business activity.

127. Upon information and belief, Williams' purposes, shared by Spiegelman, in inducing Jacov and Glattman to enter into the Partnership and to execute the General Partnership Agreement were: (i) to mislead them into believing the Partnership, under Williams' management, would participate in the Hempstead Redevelopment Project and carry on the business activities described in the General Partnership Agreement on behalf of the partners; (ii) to induce them to continue to "pledge" the Escrowed Funds to fictive Partnership business activities; (iii) to perpetuate the RICO Defendants' control and further theft of the remaining Escrowed Funds.

<u>29 Buildings</u>

128. When, by the Spring of 2008, Williams and Spiegelman had not reported any progress with respect to the Partnership's participation in the Hempstead Redevelopment Project, Jacov and Glattman advised them they wished to withdraw the Escrowed Funds and use them for other purposes.

129. In or around April or early May 2008, shortly after Jacov and Glattman had expressed their intention to withdraw the Escrowed Funds, Williams "presented" them with yet another one of the Section 8 Deals – the purported "opportunity" for the Partnership to purchase 29 Section 8 buildings (the "29 Buildings"), on 20 parcels of land in Manhattan, from NBUF "as a court-appointed receiver" for BUFNY, the purported owner of the 29 Buildings.

130. Williams represented that the price asked for the 29 Buildings was $8,000,000.00, but that he would be able to negotiate its reduction to $4,500,000.00 – the amount of allegedly outstanding tax liens, and the same sum set aside by Plaintiffs in Spiegelman's escrow accounts for the Noble Drew Purchase.

131.    Williams further represented to Jacov and Glattman that rents from the 29 Buildings, in an as yet undetermined amount, were being held in "trust accounts", and would be turned over to the purchaser of the 29 Buildings upon closing and completion of an audit of rents being conducted by the New York State Inspector General.

132.    In reliance on Williams' representations, Jacov and Glattman agreed that the Partnership would purchase the 29 Buildings through Penguin, as purchaser.

133.    In May, 2008, Williams presented Jacov and Glattman with a contract (the "29 Buildings Contract") for purchase of the 29 Buildings by Penguin for $4,500,000.00, with closing scheduled for May 30, 2008.

134.    The 29 Buildings Contract named NBUF Development as the seller, in the capacity of "ASSIGNEE, APPOINTEE and SUBSIDIARY OF BLACK UNITED FUND OF NEW YORK, and its satellites, subsidiaries and Limited Liability Corporations."

135.    The 29 Buildings Contract represented "Seller is the sole owner of the [subject] Premises."

136.    Upon information and belief, the representations in the 29 Buildings Contracts, and those made by Williams prior to its preparation, were false, in at least the following respects: (i) none of the 29 Buildings was owned, either in whole or in part, by BUFNY or by NBUF Development; (ii) neither NBUF nor NBUF Development had ever been appointed receiver for BUFNY, or was an assignee, appointee, or subsidiary of BUFNY; and (iii) NBUF, NBUF Development and BUFNY possessed no right or authority to sell or to convey, or to enter into any contract to sell or to convey, any of the 29 Buildings. Williams and Spiegelman knew these representations were false when they were made.

27

137.    The 29 Buildings Contract: (i) did not require any down payment by Penguin, but instead required the entire $4,500,000.00 purchase price be held "in escrow, with [the buyer's attorney] David Spiegelman, Esq. escrow agent for the transaction, until such time as the closing of title"; and (ii) provided the allegedly escrowed $4,500,000.00 would "be released directly from those accounts already demonstrated to the City of New York by the escrow agent, and monitored thereby."

138.    The 29 Buildings Contract did not identify the accounts "demonstrated to the City of New York by the escrow agent" or describe the manner in which they were being "monitored".

139.    In or around early May 2008, Williams signed the 29 Buildings Contract, allegedly on behalf of the Seller, and Glattman signed it on behalf of Penguin, as purchaser.

140.    Upon execution, Williams took the 29 Buildings Contract, claiming he would submit it on behalf of the Partnership for required approvals by the Offices of New York State's Inspector General (the "IG") and Attorney General (the "AG"), and by the City of New York.

141.    In or around September 2008, Williams and Spiegelman advised Plaintiffs that: (i) NYC had "foreclosed" upon the tax liens against the 29 Buildings; (ii) NYC had become "temporary administrator" of the 29 Buildings and, in that capacity, now required amendments to the 29 Buildings Contract; and (iii) for these reasons, closing of the purchase of the 29 Buildings would be further delayed.

142.    Upon information and belief, Williams' and Spiegelman's advice described in paragraph 141 was false and was known by Williams and Spiegelman to be false when given.

143.    Williams and Spiegelman presented Jacov and Glattman with an amendment (the "Amendment") to the 29 Buildings Contract which, among other things, contained provisions

purporting to require the retention of a management company to manage the 29 Buildings after closing of the purchase, and to grant the City of New York the right to approve the management company.

144.    The Amendment also contained the following "Escrow Provision":

"The escrow agent, David Spiegelman, shall remain in full force and effect as shall all his pre-signed commitments and overtures. All fund set aside and 'locked' pursuant to the escrow agreement with the Escrowee and the City of New York, shall remain so sealed until the closing on title in accordance with the contract of sale. The purchase price and set aside as agreed thereto shall remain four million five hundred thousand dollars ($4,500,000.00) and the added provisions hereto shall not increase the same."

145. In or around September 2008, Williams signed the Amendment, allegedly on behalf of the Seller, Glattman and Jacov signed it on behalf of Penguin, as purchaser, and Spiegelman signed it, as escrowee. Upon its execution, Williams took the Amendment, representing again that he would submit it on behalf of the Partnership for required approvals by the IG, the AG, and the City of New York.

146.    To ensure consistency in the misrepresentations Spiegelman and Williams had made and would yet make to Jacov and Glattman about the 29 Buildings deal, on or about November 24, 2008, in preparation for a meeting among Williams, Spiegelman, Jacov and Glattman concerning the 29 Buildings and other matters, Spiegelman faxed a memorandum to Williams in which Spiegelman filled Williams in on specific lies he had told Jacov and Glattman about the 29 Buildings deal, including:

(i) Spiegelman had "made three trips [to Albany] to discuss this matter in detail", with the IG, the AG or both;

(ii) "the terms of the management contract which will be signed at closing, are not complete";

(iii) "An audit is being conducted by the IG's office to determine if the money was properly managed by the State during receivership";

(iv) "**When we are sold the buildings, I have told them that YOU negotiated to have all the funds held in trust transferred to the new owners. Of course the money in the trust accounts must be audited before a number can be put on them, but the total can be anywhere between $2-$20million. PETE is supremely interested in this**" (bold type and underlining in original);

(v) "I have told them that the trust money, whatever amount it finally turns out to be, will be released approximately 10 days post closing";

(vi) "Because of the nature of this deal (i.e. the receivership etc.) the State will be very active in oversight for a little while after we buy the buildings, to make sure we settle into our roles ok."

147.    In late 2008, Williams and Spiegelman advised Plaintiffs the IG and the AG had approved the 29 Buildings Contract and the Amendment, and returned to Plaintiffs copies of both, stamped, allegedly by the IG, "APPROVED OIG".

148.    Upon information and belief, Williams' and Spiegelman's representations that the 29 Buildings Contract and Amendment had been presented to and approved by the IG and by the AG were false, and were known by Williams and Spiegelman to be false when made.

149. Upon information and belief, the "APPROVED OIG" stamps on the copies of the 29 Buildings Contract and the Amendment returned to Plaintiffs were not affixed by the IG, but were forgeries, and were known by Williams and Spiegelman to be forgeries when delivered to Jacov and Glattman.

150. After return of the 29 Buildings Contract and the Amendment to Plaintiffs, Williams and Spiegelman, represented to Plaintiffs that closing on Penguin's purchase of the 29 Buildings had been further delayed by the IG and by NYC due to issues which had arisen over BUFNY's possible mishandling of rents.

151. Upon information and belief, the representations described in paragraph 150 were false, and were known by Williams and Spiegelman to be false when made.

152. In or around mid-May 2009, following Jacov's and Glattman's return from a short out-of-town business trip, Spiegelman advised them that, in their absence: (i) he had attended the closing of Penguin's purchase of the 29 Buildings on May 12: (ii) he had paid the $4,500,000.00 in purchase funds he had been holding in escrow over to the New York City Department of Finance ("DOF"); (iii) the deeds to the 29 Buildings (the "29 Buildings Deeds") likewise had been delivered in escrow to the DOF; and (iv) the DOF would hold both the $4,500,000.00 and the deeds pending completion of an audit of the prior owner's handling of rents.

153. Upon information and belief, Spiegelman made the representations set forth in paragraph 152 pursuant to agreement with Williams.

154. Upon information and belief, Spiegelman's representations, set forth in paragraph 152, were false, and were known by Spiegelman and by Williams to be false when made.

155. Contemporaneously with the misrepresentations set forth in paragraph 152 and, upon information and belief, pursuant to agreement with Williams, Spiegelman delivered to

Plaintiffs what he claimed to be a copy of a memorandum issued by the DOF (the "DOF Memorandum"), printed on letterhead bearing the names "NYC Finance" and 'NYC DEPARTMENT OF FINANCE".

156.  The DOF Memorandum was addressed to Corporation Counsel at 100 Church Street, New York, NY 10007, was subscribed, "Fara Plimpton, Deputy Commissioner of Finance", and advised that DOF had received the "$4,500,000.000 to [sic] regard to the matter identified as #4687314," allegedly a reference to Plaintiffs' purchase of the 29 Buildings, and the "affected properties will be released to the Grantee upon completion of all pre-requisites and final audit."

157.  Upon information and belief, the DOF Memorandum was a forgery; it had not been created or issued by the DOF; its advice and representations were false.

158.  Upon information and belief, when Spiegelman delivered the DOF Memorandum to Plaintiffs, Spiegelman and Williams knew it was forged, and knew its advice and representations were false.

159.  Along with the DOF Memorandum, and upon information and belief pursuant to agreement with Williams, Spiegelman delivered to Penguin documents which he claimed were photocopies of the 29 Buildings Deeds delivered to DOF in escrow at the closing of the 29 Buildings purchase.

160.  The grantor named in each of the 29 Buildings Deeds was "NEW YORK CITY DEPARTMENT OF HOUSING, PRESERVATION AND DEVELOPMENT as RECEIVER PURSUANT TO COURT ORDER."

161.  Spiegelman advised Jacov and Glattman, upon information and belief pursuant to agreement with Williams, that NYCHPD had been appointed by "the court" as receiver for

BUFNY due to "frauds" perpetrated by the latter including its corrupt handling of rents from the 29 Buildings.

162.   Upon information and belief, the advice set forth in paragraph 161 was false, and was known by Spiegelman and Williams to be false when given.

163.   Each of the 29 Buildings Deeds was subscribed, "Michael Hess, Esq., As Attorney in Fact", and bore an acknowledgment of execution by "NEW YORK CITY DEPARTMENT OF HOUSING, PRESERVATION AND DEVELOPMENT as RECEIVER PURSUANT TO COURT ORDER," purportedly taken by one "Carol L. Hamler", as notary.

164.   Upon information and belief, the 29 Buildings Deeds, and the signatures of Michael D. Hess thereon, were forgeries; none of the deeds had been issued by, or executed on behalf of, NYCHPD; none was effective to convey any interest in any of the properties described therein.

165.   Upon information and belief, when Spiegelman delivered copies of the 29 Buildings Deeds to Plaintiffs, Spiegelman and Williams knew they were forgeries, and were ineffective to convey any interest in any of the 29 Buildings to Penguin.

166.   Upon information and belief, Spiegelman and Williams created or caused the creation of the 29 Buildings Contract, the Amendment, the forged "APPROVED OIG" stamps, the forged the DOF Memorandum, and the forged the 29 Buildings Deeds, to deceive Jacov and Glattman into believing, initially, that Spiegelman was continuing to hold the Escrowed Funds, and subsequently that the Escrowed Funds had been paid over to DOF and that title to the 29 Buildings would soon be delivered to Penguin.

167.   Upon information and belief, Williams' and Spiegelman's purposes in deceiving Plaintiffs, as described in paragraph 166, were to avoid Plaintiffs' discovery of the Thefts, to retain control of the remainder of the Escrowed Funds, and to perpetuate further Thefts.

### NYCHA Houses

168.    In telephone conversations and in-person meetings in or around the first three months of 2008, Williams and Spiegelman presented Jacov and Glattman with another one of the Section 8 Deals – the "opportunity" to purchase from NYCHA Section 8 properties consisting of one and two family houses (the "NYCHA Houses") to which the City of New York had acquired title, either by conveyance from HUD or through foreclosure.

169.    On or about the Summer of 2008, Williams faxed to Spiegelman, and Spiegelman provided to Jacov and Glattman, a list of the NYCHA Houses.

170.    Williams and Spiegelman further represented that, although NYCHA was offering these properties for public sale, through personal influence with Earl Andrews, Jr., the Deputy Commissioner of NYCHA, Williams could arrange for private "bulk" purchases of these properties by the Partnership at $50,000.00 per property.

171.    Subsequently, in the Fall of 2008 and winter of 2009, Williams and Spiegelman presented to Jacov and Glattman three contracts (collectively, the "NYCHA Houses Contracts"): (i) the first, dated October 2008, for the sale by NYCHA of 33 identified houses at the bulk purchase price of $1,625,000.00, to close no later than February 2, 2009 (the "October 2008 NYCHA Contract"); (ii) the second, dated November 2008, for the sale by NYCHA of 27 identified houses at the bulk purchase price of $1,350,000.00, to close no later than March 2, 2009 (the "November 2008 NYCHA Contract"); and (iii) the third, dated February 5, 2009, for the sale by NYCHA of 63 identified houses at the bulk purchase price of $3,175,000.00, to close no later than July 2, 2009 (the "February 2009 NYCHA Contract").

172.    The November 2008 NYCHA Contract named Tepeeter Development Group Inc. ("Tepeeter"), a corporation formed and owned by plaintiffs Jacov and Glattman, as purchaser.

173.    In or about November 2008, Glattman signed the November 2008 NYCHA Contract on behalf of Tepeeter.

174.    The October 2008 NYCHA Contract and February 2009 NYCHA Contract named Plaintiff RWB as purchaser.

175.    On or about October, 2008 and February 5, 2009, respectively, Glattman signed the October 2008 NYCHA Contract and the February 2009 NYCHA Contract on behalf of RWB.

176.    Williams and Spiegelman returned "executed" copies of the October 2008 NYCHA Contract, the November 2008 NYCGA Contract, and the February 2009 NYCHA Contract to Jacov and Glattman.

177.    The October 2008 NYCHA Contract and November 2008 NYCHA Contract bore signatures, on behalf of NYCHA, purporting to be those of: (i) Tino Hernandez, as Chairman; (ii) Earl Andrews, Jr., as Deputy Chairman; (iii) Margarita Lopez, as "Member"; and (iv) Vilma Huertas, as "Secretary".

178.    The February 2009 NYCHA Contract bore the signatures, on behalf of NYCHA, of: (i) Earl Andrews, Jr., as Chairman; (ii) Douglas Apple, as Deputy Chairman; (iii) Margarita Lopez, as "Member"' and (iv) Vilma Huertas, as "Secretary".

179.    Upon information and belief, the NYCHA Houses Contracts were fraudulent in that: (i) the purported signatures of Tino Hernandez, Earl Andrews, Jr., Douglas Apple, Margarita Lopez, and Vilma Huertas were forged; (ii) NYCHA had not authorized bulk sales of any of the NYCHA properites to RWB or to Tepeeter.; and (iii) NYCHA had not agreed to any of the terms in the contracts.

180. Upon information and belief, when the NYCHA Houses Contracts were presented to Jacov and Glattman, Williams and Spiegelman knew they were fraudulent, and knew the signatures they bore, purportedly on behalf of NYCHA, were forgeries.

181. Upon information and belief, the NYCHA Houses Contracts were created, and the signatures purportedly made on behalf of NYCHA were forged, to deceive Plaintiffs into believing that Spiegelman was continuing to hold the Escrowed Funds.

182. Upon information and belief, defendants' purpose in deceiving Plaintiffs, as described in paragraphs 168-181, was to avoid Plaintiffs' discovery of the Thefts, to retain control of the remainder of the Escrowed Funds, and to perpetuate further thefts from Plaintiffs.

<u>The Thefts</u>

183. Plaintiffs first discovered the Thefts, described in the following paragraphs, on or after February 3, 2011.

184. Upon discovery of the Thefts, Plaintiffs made demand of Spiegelman and Williams for return or repayment of the stolen funds.

185. Despite this demand, neither Spiegelman nor Williams ever returned or repaid any of the stolen funds.

<u>Thefts from Spiegelman's HSBC IOLA</u>

186. Between September 1, 2005 and February 9, 2009, Spiegelman held funds in trust in the HSBC IOLA funds for Jacov and Glattman and for various entities they owned including, upon information and belief, HTA, CFH, Ambassador, RWB, Bdlak, Shpitz, and 2000.

187. Between September 1, 2005 and February 9, 2009, acting on behalf of Defendants, Spiegelman withdrew funds he held in trust for Plaintiffs in the HSBC IOLA, without their

knowledge and consent, and stole those funds, through a series of checks and wire transfers, including the following:

| Type | Check No. | Date | Amount | Payee or Recipient Account |
|------|-----------|------|--------|----------------------------|
| Check | 1403 | 9/1/05 | $5,000.00 | Inner City Strategies |
| Check | 3293 | 10/7/05 | $3,600.00 | Inner City Strategies |
| Check | 1436 | 10/20/05 | $10,000.00 | FCD |
| Check | 1475 | 11/22/05 | $10,000.00 | Brenner, Baron, Rosin |
| Check | 1489 | 11/30/05 | $3,600.00 | Inner City Strategies |
| Check | 1575 | 12/21/05 | $5,000.00 | Inner City Strategies |
| Check | 1580 | 1/6/06 | $3,600.00 | Inner City Strategies |
| Check | 1599 | 2/3/06 | $7,600.00 | Inner City Strategies |
| Check | 1614 | 2/16/06 | $8,000.00 | Inner City Strategies |
| Check | 1657 | 3/3/06 | $3,600.00 | Inner City Strategies |
| Check | 1649 | 3/30/06 | $3,600.00 | Inner City Strategies |
| Check | 1665 | 4/10/06 | $7,200.00 | Inner City Strategies |
| Check | 1674 | 5/3/06 | $7,200.00 | Inner City Strategies |
| Check | 1703 | 6/1/06 | $7,200.00 | Inner City Strategies |
| Check | 1730 | 7/6/06 | $3,600.00 | Inner City Strategies |
| Check | 1782 | 8/9/06 | $3,600.00 | Inner City Strategies |
| Check | 1787 | 8/11/06 | $3,600.00 | Inner City Strategies |
| Check | 1826 | 8/25/06 | $8,215.00 | NYJTL |
| Check | 1827 | 9/8/06 | $7,600.00 | Inner City Strategies |
| Check | 1844 | 9/22/06 | $25,000.00 | Inner City Strategies |

| | | | | |
|---|---|---|---|---|
| Check | 1853 | 9/27/06 | $10,000.00 | Inner City Strategies |
| Check | 1894 | 10/23/06 | $7,200.00 | Inner City Strategies |
| Check | 1897 | 10/26/06 | $10,000.00 | Inner City Strategies |
| Check | 1921 | 12/4/06 | $7,600.00 | Inner City Strategies |
| Check | 1957 | 12/13/06 | $7,200.00 | Inner City Strategies |
| Check | 1960 | 12/__/06 | $10,000.00 | Nisselson |
| Check | ____ | 12/__/06 | $9,000.00 | Inner City Strategies |
| Wire | | 12/28/06 | $150,000.00 | CNB Penguin Acct[2] |
| Check | 1967 | 1/__/07 | $50,000.00 | Election 06 |
| Check | 1969 | 1/__/07 | $30,000.00 | Election 06 |
| Wire | | 1/18/07 | $50,000.00 | Inner City Strategies (CNB) |
| Check | ____ | 1/19/07 | $50,000.00 | Inner City Strategies |
| Check | 1986 | 1/19/07 | $7,200.00 | Inner City Strategies |
| Check | 1987 | 1/19/07 | $22,000.00 | Inner City Strategies |
| Check | 2034 | 2/23/07 | $20,000.00 | Inner City Strategies |
| Check | 2035 | 2/23/07 | $7,200.00 | Inner City Strategies |
| Check | 2070 | 3/14/07 | $7,200.00 | Inner City Strategies |
| Check | 2098 | 4/2/07 | $7,200.00 | Inner City Strategies |
| Check | 2143 | 5/4/07 | $7,200.00 | Inner City Strategies |
| Check | ____ | 5/__/07 | $35,000.00 | Inner City Strategies |
| Check | 2180 | 5/18/07 | $33,000.00 | Inner City Strategies |
| Check | 2192 | 5/29/07 | $46,000.00 | Inner City Strategies |

---

[2] See ¶¶ 195-200 *infra* for allegations concerning the opening and funding of the "CNB Penguin Account".

| Check | 2139 | 6/6/07 | $7,200.00 | Inner City Strategies |
|-------|------|--------|-----------|------------------------|
| Check | 2252 | 6/21/07 | $75,000.00 | Inner City Strategies |
| Check | 2253 | 6/21/07 | $20,000.00 | Inner City Strategies |
| Wire | | 6/22/07 | $580,383.90 | CNB Penguin Acct |
| Check | 2260 | 7/10/07 | $50,000.00 | Inner City Strategies |
| Check | 2308 | 7/25/07 | $50,000.00 | Fabian Cedillo |
| Check | 2376 | 9/7/07 | $7,200.00 | Inner City Strategies |
| Check | 2377 | 9/7/07 | $17,500.00 | Inner City Strategies |
| Check | 2431 | 9/24/07 | $210,000.00 | Inner City Strategies |
| Check | 2448 | 10/8/07 | $25,000.00 | First Pro Group |
| Check | 2474 | 10/10/07 | $25,000.00 | First Pro Group |
| Check | 2482 | 10/30/07 | $7,200.00 | Inner City Strategies |
| Check | 2502 | 11/8/07 | $7,200.00 | Inner City Strategies |
| Check | 2548 | 12/12/07 | $14,400.00 | Inner City Strategies |
| Check | 2573 | 1/2/08 | $7,721.00 | DOL-OSHA |
| Check | 2656 | 2/13/08 | $14,200.00 | Inner City Strategies |
| Check | 2698 | 3/14/08 | $7,200.00 | Inner City Strategies |
| Check | 2705 | 3/19/08 | $7,200.00 | Inner City Strategies |
| Check | 2714 | 3/24/08 | $20,000.00 | Bert Levine, as Attorney |
| Check | 2696 | 3/28/08 | $40,000.00 | Bert Levine, as Attorney |
| Check | 2712 | 4/10/08 | $7,200.00 | Inner City Strategies |
| Check | 2786 | 5/2/08 | $15,000.00 | Bert Levine, as Attorney |
| Check | 2810 | 5/23/08 | $10,000.00 | Inner City Strategies |

| Check | 2827 | 5/29/08 | $15,000.00 | Joseph Rutowski |
|---|---|---|---|---|
| Check | 2837 | 6/5/08 | $12,000.00 | Inner City Strategies |
| Check | 2882 | 6/20/08 | $15,000.00 | Joseph Rutowski |
| Check | 2894 | 6/24/08 | $15,000.00 | Joseph Rutowski |
| Check | 2896 | 6/25/08 | $7,600.00 | Inner City Strategies |
| Check | 2899 | 6/26/08 | $9,000.00 | NYS DOS |
| Check | 2965 | 8/5/08 | $15,000.00 | Joseph Rutowski |
| Check | 2932 | 8/18/08 | $18,500.00 | Inner City Strategies |
| Check | 2995 | 8/20/08 | $7,000.00 | Inner City Strategies |
| Check | 2942 | 8/20/08 | $15,000.00 | Inner City Strategies |
| Check | 3000 | 8/26/08 | $89,000.00 | Inner City Strategies |
| Check | 2992 | 9/23/08 | $5,000.00 | Greenpoint Mortgage |
| Check | 2997 | 9/25/08 | $6,210.00 | Joseph Rutowski |
| Check | 3115 | 10/31/08 | $35,000.00 | Inner City Strategies |
| Check | ___ | _____ | $14,400.00 | Inner City Strategies |
| Check | 3066 | 11/21/08 | $27,500.00 | Greenpoint Mortgage |
| Wire | | 11/26/08 | $55,000.00 | Spiegelman (Esquire Bank) |
| Wire | | 2/11/09 | $10,000.00 | Spiegelman (Esquire Bank) |

188.   In addition to facilitating the Thefts identified in paragraph 187, upon information and belief the listed checks and wire transfers to Inner City Strategies ("ICS"), First Pro Group, and the CNB Penguin Account were made to the payees and recipients thereof for the purpose, and as a means, of disguising the true source of the funds.

189. Upon information and belief, in drawing, negotiating, depositing, and otherwise transmitting and handling the checks and wire transfers identified in paragraph 187, Defendants caused some or all of the subject stolen funds to be transported between states including the states of New York, New Jersey and Pennsylvania.

190. The funds identified in paragraph 187 as having been transferred by check or by wire to ICS were deposited in CNB account no. ▓▓▓▓▓▓ in the name of ICS (the "ICS Account").

191. Upon information and belief, with the knowledge and assistance of CNB, Defendants withdrew from the ICS account a substantial portion or perhaps all of the funds transferred to ICS from the HSBC IOLA, in a series of "structured" cash withdrawals, each less than $10,000.00 in amount, to avoid cash transaction reporting requirements under 31 U.S.C. §§ 5313 and 5326, and regulations promulgated thereunder.

Thefts from Spiegelman's CNB IOLA

192. Between November 30, 2005 and November 26, 2007, acting on behalf of Defendants, Spiegelman withdrew funds he held in trust for Plaintiffs in the CNB IOLA, without their knowledge and consent, and stole them, through a series of unnumbered checks, CNB intrabank electronic transfers, and wire transfers, including:

| Type | Date | Amount | Payee or Recipient Account |
|------|------|--------|---------------------------|
| Check | 11/30/05 | $10,000.00 | Inner City Strategies |
| Check | 1/24/06 | $2,000,000.00 | CNB Penguin Account |
| Check | 2/21/06 | $9,000.00 | Inner City Strategies |
| Intrabank | 7/27/06 | $8,500.00 | Inner City Strategies |
| Intrabank | 11/3/06 | $50,000.00 | Inner City Strategies |

| Intrabank | 12/28/06 | $392,000.00 | CNB Penguin Account |
| Check | 4/__/07 | $75,000.00 | Inner City Strategies |
| Wire | 8/24/07 | $400,000.00 | HSBC IOLA |
| Wire | 10/26/07 | $100,000.00 | HSBC IOLA |

193.   In addition to facilitating theft of the funds identified in paragraph 192, upon information and belief, the listed checks and intrabank transfers to ICS and to the CNB Penguin Account were made to the payees and recipients thereof for the purpose, and as a means, of disguising the true source of the funds.

194.   Upon information and belief, in drawing, negotiating, depositing, and otherwise transmitting and handling the checks and intrabank transfers to ICS and to the CNB Penguin Account identified in paragraph 192, Defendants caused some or all of the subject stolen funds to be transported between states including the states of New York, New Jersey and Pennsylvania.

195.   The funds identified in paragraph 192 as having been transferred by check or by wire to ICS were deposited in CNB account no. ▬▬▬▬▬ in the name of ICS (the "ICS Account").

196.   Upon information and belief, with the knowledge and assistance of CNB, Defendants withdrew from the ICS account a substantial portion or perhaps all of the funds transferred to ICS from the CNB IOLA, in a series of "structured" cash withdrawals, each less than $10,000.00 in amount, to avoid cash transaction reporting requirements under 31 U.S.C. §§ 5313 and 5326, and regulations promulgated thereunder.

Thefts from the CNB Penguin Account

195.  On or about January 24, 2006, acting on behalf of Defendants, and without the knowledge or consent of Penguin, Spiegelman opened checking account no. ▨▨▨▨▨▨▨, in Penguin's name, with CNB in New York (the "CNB Penguin Account").

196.  In opening the CNB Penguin Account for Spiegelman, CNB violated standards customary in the banking industry, as well as its own internal rules and procedures, in at least the following respects: (i) CNB failed to require, and did not receive, duly executed corporate resolutions from Penguin authorizing the opening of the account; (ii) CNB accepted a signature card which contained only two utterly illegible scrawls of purportedly authorized signatories, whose names were not discernible or otherwise provided in any legible form; (iii) CNB failed to require, and did not receive, any form of identification of the purported signatories; (iv) CNB failed to require, and did not receive, verifiable exemplars of the signatures of the purported signatories; and (v) without any form of authorization from Penguin, at Spiegelman's direction, CNB provided for mailing of account statements "c/o David Spiegelman Office" rather than to Penguin.

197.  In a conversation with Jacov and Glattman on or about June 1, 2011, at CNB's offices in Newark, New Jersey, after Plaintiffs' discovery of the Thefts, CNB's Vice President Wright admitted CNB violated proper procedures in the opening of the CNB Penguin Account.

198.  On January 24, 2006, in furtherance of Defendants' fraudulent scheme, and without the knowledge or authority of Penguin, or of any other Plaintiff, Defendant Spiegelman deposited in the CNB Penguin Account: (i) check no. 1593 for $213,000.00, payable to "D. Penguin Brothers LTD.", drawn on the HSBC IOLA, representing funds which belonged to, and which Spiegelman had been holding in trust for, one or more of the Plaintiffs; and (ii) an

unnumbered check for $2,000,000.00, payable to "D. PENGUIN BROTHERS LTD", drawn on the CNB IOLA, representing funds which belonged to, and which Spiegelman had been holding in trust for, one or more of the Plaintiffs.

    199.  On December 28, 2006, in furtherance of Defendants' fraudulent scheme, and without the knowledge or authority of Penguin, or any other Plaintiff, Spiegelman made two deposits into the CNB Penguin Account, totaling $542,000.00, representing funds which belonged to, and which Spiegelman had been holding in trust for, one or more of the Plaintiffs. Spiegelman made one of the two deposits, in the amount of $392,000.00, by intrabank electronic transfer from the CNB IOLA, and the other, in the amount of $150,000.00, by wire transfer from the HSBC IOLA.

    200.  On June 22, 2007, in furtherance of Defendants' fraudulent scheme, and without the knowledge or authority of Plaintiff Penguin, or any other Plaintiff, by wire transfer from the HSBC IOLA, Spiegelman deposited in the CNB Penguin Account the sum of $580,383.90, representing funds which belonged to, and which he had been holding in escrow for, one or more of the Plaintiffs.

    201.  Between September 1, 2006 and July 31, 2009, acting on behalf of Defendants, Spiegelman withdrew and misappropriated all of the funds deposited in the CNB Penguin Account through a series of checks and CNB intrabank electronic transfers, including:

| Type | Check No. | Date | Amount | Payee |
| --- | --- | --- | --- | --- |
| Check | 1002 | 9/1/06 | $1,000,000.00 | D. Penguin Brothers |
| Check | 1001 | 3/14/07 | $75,000.00 | Inner City Strategies |
| Check | 1003 | 7/2/07 | $75,000.00 | Inner City Strategies |
| Check | 1004 | 7/2/07 | $50,000.00 | Inner City Strategies |

| Check | 1005 | 7/2/07 | $70,000.00 | Inner City Strategies |
|-------|------|--------|------------|-----------------------|
| Check | 1006 | 7/2/07 | $30,000.00 | Inner City Strategies |
| Check | 1007 | 7/2/07 | $275,000.00 | David Spiegelman, as atty |
| Intrabank | | 7/9/07 | $500,000.00 | CNB IOLA |
| Check | 1008 | 8/31/07 | $165,000.00 | Inner City Strategies |
| Check | 1010 | 9/12/07 | $135,000.00 | David Spiegelman, as atty |
| Check | 1009 | 9/30/07 | $300,000.00 | David Spiegelman, as atty |
| Check | 1011 | 10/9/07 | $100,000.00 | David Spiegelman, as atty |
| Check | 1012 | 10/19/07 | $200,000.00 | David Spiegelman, as atty |
| Intrabank | | 11/13/07 | $335,000.00 | Inner City Strategies |
| Check | 1014 | 11/1/07 | $100,000.00 | David Spiegelman, as atty |
| Check | 1015 | 11/21/07 | $15,000.00 | David Spiegelman, as atty |
| Check | 1016 | 11/21/07 | $35,000.00 | David Spiegelman, as atty |
| Check | 1017 | 5/20/09 | $7,793.97 | David Spiegelman, as atty |

202.　　Upon information and belief, in effecting the intrabank transfers of 7/9/07 and 11/13/07, CNB accepted and acted upon debit memoranda signed by Spiegelman in the presence of one or more of CNB's officers and employees, including one Ms. Brice, despite CNB's knowledge that: (i) Spiegelman was not signing his own name to the memoranda; (ii) Spiegelman had not been made an authorized signatory on the account by Penguin; and (iii) the signatures made by Spiegelman on the memoranda did not match his own signatures on the signature card he prepared and submitted to CNB in opening the CNB IOLA.

Fraudulent Loans Taken in the Names of Plaintiffs

203.  As set forth in the table below, acting on behalf of Defendants, and without the knowledge of any of the Plaintiffs, Spiegelman stole additional funds from Plaintiffs, as follows:

(a) Spiegelman took the following sums, representing in each case a portion of monies entrusted to him for the purchase of a piece of real property in Queens County, and replaced them with monies "borrowed" in the name of either Ambassador or RWB. To obtain each such "loan", Spiegelman forged Glattman's signature on a promissory note, both as president of the purported borrower/maker, and as personal guarantor:

| Property | Date (approx.) | Amount | Purported Borrower |
|---|---|---|---|
| 155-29 115th Drive | 8/20/10 | $24,000.00 | Ambassador |
| 126-36 146th Street | 2/19/10 | $12,500.00 | Ambassador |
| 153-18 118th Avenue | 1/29/10 | $9,000.00 | Ambassador |
| 150-22 122nd Avenue | 8/30/10 | $23,000.00 | Ambassador |
| 194-38 112th Avenue | 4/22/10 | $21,000.00 | Ambassador |
| 114-30 133rd Street | 4/2/10 | $15,000.00 | Ambassador |
| 205-27 112th Avenue | 2/16/10 | $23,000.00 | RWB |
| 149-42 124th Street | 5/21/09 | $17,000.00 | Ambassador |
| 130-15 146th Street | 5/27/10 | $25,000.00 | Ambassador |
| 157-15 N. Conduit | 10/27/10 | $22,250.00 | Ambassador |
| 152-37 118th Avenue | 2/26/09 | $14,000.00 | Ambassador |
| 118-14 Long Street | 9/17/09 | $28,000.00 | Ambassador |
| 144-35 58th Street | 1/8/09 | $20,000.00 | Ambassador |
| 178-01 13th Avenue | 2/8/10 | $23,250.00 | Ambassador |
| 111-18 159th Street | 8/19/09 | $13,000.00 | RWB |

| | | | |
|---|---|---|---|
| 150-47 118th Drive | 8/12/09 | $12,600.00 | Ambassador |
| 14-14 Gipson Street | 9/17/09 | $16,500.00 | Ambassador |
| 117-14 205th Street | 2/20/09 | $21,250.00 | Ambassador |
| 194-27 112th Avenue | 1/28/10 | $21,000.00 | RWB |
| 115-37 159th Street | 6/18/10 | $19,400.00 | Ambassador |
| 153-26 118th Avenue | 6/16/09 | $14,000.00 | Ambassador |
| 324-__ __89th Street | 8/25/10 | $15,500.00 | _____ |
| 249-04 Memphis Avenue | 11/5/10 | $35,000.00 | Ambassador |

(b) With respect to each of the following properties in the County of Queens owned by Plaintiff Ambassador, Spiegelman either took a loan secured by a mortgage, forging the signature of Ambassador's president, Glattman, on a promissory note and mortgage, or failed to pay off a mortgage with money entrusted to him by Ambassador for that purpose:

| Property | Loan Date | Lender | Amount |
|---|---|---|---|
| 167-42 146th Rd. | 1/26/2010 | Linda Funding LLC | $302,400.00 |
| 128-08 140th St. | 5/16/2010 | Benjamin Funding Corp. | $109,800.00 |
| 128-11 149th St. | 5/4/2009 | Benjamin Funding Corp. | $225,000.00 |

(c) With respect to the following property in the County of Kings, owned by 64 Green, Spiegelman failed to pay off a mortgage with money entrusted to him by 64 Green for that purpose:

| Property | Loan Date | Lender | Amount |
|---|---|---|---|
| 64 Green St. | 10/24/2010 | LaSalle Bank/MERS | $660,000.00 |

FIRST CLAIM
Penguin Against the RICO Defendants
COMMON LAW CONVERSION

204.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

205.   By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy, and acting on behalf of the RICO Defendants, Spiegelman, Williams, ICS, and CNB, knowingly and intentionally embezzled and converted $3,335,393.90 of Penguin's funds.

206.   Penguin has been damaged by the conversion in an amount, to be determined by the trier of fact, not less than $3,335,393.90, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

SECOND CLAIM
HTA Against the RICO Defendants
COMMON LAW CONVERSION

207.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

208.   By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount of HTA's funds.

209.   HTA has been damaged by the conversion in an amount, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

### THIRD CLAIM
### CFH Against the RICO Defendants
### COMMON LAW CONVERSION

210.     Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

211.     By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount, not less than $3,000,000.00, of CFH's funds.

212.     CFH has been damaged by the conversion in an amount, not less than $3,000,000.00, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

### FOURTH CLAIM
### Ambassador Against the RICO Defendants
### COMMON LAW CONVERSION

213.     Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

214.     By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount of Ambassador's funds.

215.     Ambassador has been damaged by the conversion in an amount, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

## FIFTH CLAIM
### RWB Against the RICO Defendants
### COMMON LAW CONVERSION

216.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

217.    By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount of RWB's funds.

218.    RWB has been damaged by the conversion in an amount, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

## SIXTH CLAIM
### 64 Against the RICO Defendants
### COMMON LAW CONVERSION

219.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

220.    By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount of 64's funds, not less than $660,000.00.

221.    64 has been damaged by the conversion in an amount, not less than $660,000.00, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

SEVENTH CLAIM
Bdlak Against the RICO Defendants
COMMON LAW CONVERSION

222.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

223.    By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of The RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount of Bdlak's funds.

224.    Bdlak has been damaged by the conversion in an amount, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

EIGHTH CLAIM
Shpitz Against the RICO Defendants
COMMON LAW CONVERSION

225.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

226.    By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount of Shpitz's funds.

227.    Shpitz has been damaged by the conversion in an amount, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

## NINTH CLAIM
### 2000 Against the RICO Defendants
### COMMON LAW CONVERSION

228. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

229. By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount of 2000's funds.

230. 2000 has been damaged by the conversion in an amount, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

## TENTH CLAIM
### Jacov Against the RICO Defendants
### COMMON LAW CONVERSION

231. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

232. By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount of Jacov's funds.

233. Jacov has been damaged by the conversion in an amount, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

ELEVENTH CLAIM
Glattman Against the RICO Defendants
COMMON LAW CONVERSION

234. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

235. By reason of the foregoing, in furtherance of the RICO Defendants' conspiracy and on behalf of The RICO Defendants, Spiegelman, Williams, ICS, First Pro, and CNB, knowingly and intentionally embezzled and converted an as yet undetermined amount, not less than $1,500,000.00, of Glattman's funds.

236. Glattman has been damaged in an amount, not less than $1,500,000.00, to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

TWELFTH CLAIM
HTA Against the RICO Defendants
COMMON LAW FRAUD

237. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

238. In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to HTA's officers and directors, Jacov and Glattman, and presented them with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving HTA and inducing it: (i) to make the payments described in paragraph 83; (ii) to contribute its own funds to the Escrowed Funds; (iii) to leave its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iv) to perpetuate the RICO Defendants' possession and control of the Escrowed Funds; and (v) to conceal the Thefts from HTA.

239.    HTA reasonably relied on Williams' and Spiegelman's misrepresentations of fact to its officers and directors described herein, and on the forged and otherwise fraudulent documents described herein, in: (i) making the payments described in paragraph 83; (ii) contributing its own funds to the Escrowed Funds; (iii) leaving its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iv) not discovering the Thefts.

240.    As the direct and proximate result of the RICO Defendants' fraud, HTA has been damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

THIRTEENTH CLAIM
CFH Against the RICO Defendants
COMMON LAW FRAUD

241.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

242.    In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to CFH's officers and directors, Jacov and Glattman, and presented them with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving CFH and inducing it: (i) to contribute its own funds to the Escrowed Funds; (ii) to leave its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iii) to perpetuate the RICO Defendants' possession and control of the Escrowed Funds; and (iv) to conceal the Thefts from CFH.

243.    CFH reasonably relied on Williams' and Spiegelman's misrepresentations of fact to its officers and directors described herein, and on the forged and otherwise fraudulent documents described herein, in: (i) contributing its own funds to the Escrowed Funds; (ii)

leaving its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iii) not discovering the Thefts.

244. As the direct and proximate result of the RICO Defendants' fraud, CFH has been damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

FOURTEENTH CLAIM
Ambassador Against the RICO Defendants
COMMON LAW FRAUD

245. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

246. In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to Ambassador's officers and directors, Jacov and Glattman, and presented them with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving Ambassador and inducing it: (i) to contribute its own funds to the Escrowed Funds; (ii) to leave its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iii) to perpetuate The RICO Defendants' possession and control of the Escrowed Funds; and (iv) to conceal the Thefts from Ambassador.

247. Ambassador reasonably relied on Williams' and Spiegelman's misrepresentations of fact to its officers and directors described herein, and on the forged and otherwise fraudulent documents described herein, in: (i) contributing its own funds to the Escrowed Funds; (ii) leaving its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iii) not discovering the Thefts.

248.    As the direct and proximate result of the RICO Defendants' fraud, Ambassador has been damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

FIFTEENTH CLAIM
RWB Against the RICO Defendants
COMMON LAW FRAUD

249.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

250.    In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to RWB's officers and directors, Jacov and Glattman, and presented them with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving RWB and inducing it: (i)  to contribute its own funds to the Escrowed Funds; (ii) to leave its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iii) to perpetuate the RICO Defendants' possession and control of the Escrowed Funds; and (iv) to conceal the Thefts from RWB.

251.    RWB reasonably relied on Williams' and Spiegelman's misrepresentations of fact to its officers and directors described herein, and on the forged and otherwise fraudulent documents described herein, in: (i) contributing its own funds to the Escrowed Funds; (ii) leaving its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iii) not discovering the Thefts.

252.    As the direct and proximate result of the RICO Defendants' fraud, RWB has been damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

SIXTEENTH CLAIM
Bdlak Against the RICO Defendants
COMMON LAW FRAUD

253.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

254.    In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to Bdlak's officers and directors, Jacov and Glattman, and presented them with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving Bdlak and inducing it: (i)  to contribute its own funds to the Escrowed Funds; (ii) to leave its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iii) to perpetuate the RICO Defendants' possession and control of the Escrowed Funds; and (iv) to conceal the Thefts from Bdlak.

255.    Bdlak reasonably relied on Williams' and Spiegelman's misrepresentations of fact to its officers and directors described herein, and on the forged and otherwise fraudulent documents described herein, in: (i) contributing its own funds to the Escrowed Funds; (ii) leaving its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iii) not discovering the Thefts.

256.    As the direct and proximate result of the RICO Defendants' fraud, Bdlak has been damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

SEVENTEENTH CLAIM
Shpitz Against the RICO Defendants
COMMON LAW FRAUD

257.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

258.   In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to Shpitz's officers and directors, Jacov and Glattman, and presented them with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving Shpitz and inducing it: (i)  to contribute its own funds to the Escrowed Funds; (ii) to leave its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iii) to perpetuate the RICO Defendants' possession and control of the Escrowed Funds; and (iv) to conceal the Thefts from Shpitz.

259.   Shpitz reasonably relied on Williams' and Spiegelman's misrepresentations of fact to its officers and directors described herein, and on the forged and otherwise fraudulent documents described herein, in: (i) contributing its own funds to the Escrowed Funds; (ii) leaving its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iii) not discovering the Thefts.

260.   As the direct and proximate result of the RICO Defendants' fraud, Shpitz was damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

58

EIGHTEENTH CLAIM
2000 Against the RICO Defendants
COMMON LAW FRAUD

261. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

262. In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to 2000's officers and directors, Jacov and Glattman, and presented them with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving 2000 and inducing it: (i) to contribute its own funds to the Escrowed Funds; (ii) to leave its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iii) to perpetuate the RICO Defendants' possession and control of the Escrowed Funds; and (iv) to conceal the Thefts from 2000.

263. 2000 reasonably relied on Williams' and Spiegelman's misrepresentations of fact to its officers and directors described herein, and on the forged and otherwise fraudulent documents described herein, in: (i) contributing its own funds to the Escrowed Funds; (ii) leaving its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iii) not discovering the Thefts.

264. As the direct and proximate result of the RICO Defendants' fraud, 2000 has been damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

NINETEENTH CLAIM
Jacov Against the RICO Defendants
COMMON LAW FRAUD

265.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

266.   In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to Jacov, and presented him with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving Jacov and inducing him: (i) to contribute his own funds to the Escrowed Funds; (ii) to leave his contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iii) to perpetuate the RICO Defendants' possession and control of the Escrowed Funds; and (iv) to conceal the Thefts from Jacov.

267.   Jacov reasonably relied on Williams' and Spiegelman's misrepresentations of fact, and on the forged and otherwise fraudulent documents described herein, in: (i) contributing his own funds to the Escrowed Funds; (ii) leaving his contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iii) not discovering the Thefts.

268.   As the direct and proximate result of the RICO Defendants' fraud, Jacov has been damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

TWENTIETH CLAIM
Glattman Against the RICO Defendants
COMMON LAW FRAUD

269.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

270.   In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to Glattman, and presented him with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving Glattman and inducing him: (i)   to contribute his own funds to the Escrowed Funds; (ii) to leave his contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iii) to perpetuate the RICO Defendants' possession and control of the Escrowed Funds; and (iv) to conceal the Thefts from Glattman.

271.   Glattman reasonably relied on Williams' and Spiegelman's misrepresentations of fact, and on the forged and otherwise fraudulent documents described herein, in: (i) contributing his own funds to the Escrowed Funds; (ii) leaving his contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iii) not discovering the Thefts.

272.   As the direct and proximate result of the RICO Defendants' fraud, Glattman has been damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

TWENTY-FIRST CLAIM
Penguin Against the RICO Defendants
COMMON LAW FRAUD

273.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

274.   In furtherance of the RICO Defendants' conspiracy and on behalf of the RICO Defendants, Spiegelman and Williams knowingly made misrepresentations of material fact described herein to Penguin, and presented Penguin with the forged or otherwise fraudulent documents described herein, for the purposes of deceiving Penguin and inducing it: (i)   to

contribute funds to the Escrowed Funds; (ii) to leave its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; (iii) to perpetuate the RICO Defendants' possession and control of the Escrowed Funds; and (iv) to conceal the Thefts from Penguin.

275.    Penguin reasonably relied on Williams' and Spiegelman's misrepresentations of fact, and on the forged and otherwise fraudulent documents described herein, in: (i) contributing its own funds to the Escrowed Funds; (ii) leaving its contribution to the Escrowed Funds in the possession and control of the RICO Defendants; and (iii) not discovering the Thefts.

276.    As the direct and proximate result of the RICO Defendants' fraud, Penguin has been damaged in an amount to be determined by the trier of fact, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

TWENTY-SECOND CLAIM
Ambassador Against the RICO Defendants
COMMON LAW FRAUD BY FORGERY

277.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

278.    In furtherance of the RICO Defendants' conspiracy, and acting on behalf of the RICO Defendants, Spiegelman forged Glattman's signature on behalf of Ambassador on the promissory notes and mortgages described in paragraphs 203 (a) and (b).

279.    As the direct and proximate cause of the forgeries of promissory notes and mortgages in its name, described in paragraphs 203 (a) and (b), Ambassador has been damaged in an amount to be determined by the trier of fact, not less than $1,025,450.00, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest, and costs.

TWENTY-THIRD CLAIM
RWB Against All The RICO Defendants
COMMON LAW FRAUD BY FORGERY

280.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

281.    In furtherance of the RICO Defendants' conspiracy, and acting on behalf of the RICO Defendants, Spiegelman forged Glattman's signature on behalf of RWB on the promissory notes and mortgages described in paragraphs 203 (a).

282.    As the direct and proximate cause of the forgeries of promissory notes in its name, described in paragraph 203 (a), RWB has been damaged in an amount to be determined by the trier of fact, not less than $57,000.00, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest, and costs.

TWENTY-FOURTH CLAIM
Glattman Against All The RICO Defendants
COMMON LAW FRAUD BY FORGERY

283.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

284.    In furtherance of the RICO Defendants' conspiracy, and acting on behalf of the RICO Defendants, Spiegelman forged Glattman's signature, as guarantor of payment, on the promissory notes and mortgages described in paragraphs 203 (a) and (b).

285.    As the direct and proximate cause of the forgeries of his signature as guarantor of payment of the promissory notes described in paragraph 203 (a) and (b), Glattman has been damaged in an amount to be determined by the trier of fact, not less than $1,082.450.00, for which the RICO Defendants are jointly and severally liable, along with punitive damages, attorneys' fees, interest, and costs.

TWENTY-FIFTH CLAIM
Plaintiffs Against Williams, Spiegelman, ICS and CNB
RICO – Violation of 18 U.S.C. § 1962(c)

286.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

287.    At all times alleged in this Complaint, Defendants Williams, Spiegelman, ICS and CNB were associates of the NBUF enterprise, participating in its operations through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5) and 1962(c), in violation of 18 U.S.C. § 1962(c).

288.    Williams intentionally participated in and furthered the operations of the NBUF enterprise through, among other acts, multiple acts of fraud perpetrated on Plaintiffs through communications and transactions effected by wire, in violation of 18 U.S.C. § 1344, multiple acts of interstate transportation of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 2314, and multiple acts of laundering of funds stolen from Plaintiffs, in violation of 18 U.S.C. §§ 1956 and 1957.

289.    Spiegelman intentionally participated in and furthered the operations of the NBUF enterprise through, among other acts, multiple acts of fraud perpetrated on Plaintiffs through communications and transactions effected by wire, in violation of 18 U.S.C. § 1344, multiple acts of interstate transportation of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 2314, and multiple acts of laundering of funds stolen from Plaintiffs, in violation of 18 U.S.C. §§ 1956 and 1957.

290.    ICS intentionally participated in and furthered the operations of the NBUF enterprise through, among other acts, multiple acts of fraud perpetrated against Plaintiffs through communications and transactions effected by wire, in violation of 18 U.S.C. § 1344, multiple

acts of interstate transportation of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 2314, and multiple acts of laundering of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 1956 and 1957.

291.   CNB intentionally participated in and furthered the operations of the NBUF enterprise thorough, among other acts, multiple acts of fraud perpetrated on Plaintiffs through transactions effected by wire, in violation of 18 U.S.C. § 1344, multiple acts of interstate transportation of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 2314, and multiple acts of laundering of funds stolen from Plaintiffs, in violation of 18 U.S.C. §§ 1956 and 1957.

292.   The predicate acts of wire fraud, interstate transportation of stolen property, and money laundering by Williams, by Spiegelman, by ICS, and by CNB, constitute a pattern of unlawful racketeering activity by each of these defendants, within the meaning of 18 U.S.C. § 1961(1)(B), connected to the racketeering acts by each of the other defendants named herein, as part of a scheme to accomplish the common purposes of fraudulent extraction of funds from Plaintiffs, use of said funds for the benefit of the NBUF enterprise, and concealment of their scheme.

293.   Each of the Plaintiffs suffered injury to its property and to its business, within the meaning of 18 U.S.C. § 1964(c) by reason of Williams', Spiegelman's, ICS's and CNB's violations of 18 U.S.C. §1962(c), in an amount to be determined by the trier of fact, for which amount trebled said defendants are jointly and severally liable, along with attorneys' fees, interest and costs.

TWENTY-SIXTH CLAIM
Plaintiffs Against Williams, Spiegelman, ICS and CNB
RICO – Violation of 18 U.S.C. § 1962(c)

294.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

295.   At all times alleged in this Complaint, Defendants Williams, Spiegelman, ICS and CNB were associates of the Association enterprise, participating in its operations through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5) and 1962(c), in violation of 18 U.S.C. § 1962(c).

296.   Williams intentionally participated in and furthered the operations of the Association enterprise through, among other acts, multiple acts of fraud perpetrated on Plaintiffs through communications and transactions effected by wire, in violation of 18 U.S.C. § 1344, multiple acts of interstate transportation of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 2314, and multiple acts of laundering of funds stolen from Plaintiffs, in violation of 18 U.S.C. §§ 1956 and 1957.

297.   Spiegelman intentionally participated in and furthered the operations of the Association enterprise through, among other acts, multiple acts of fraud perpetrated on Plaintiffs through communications and transactions effected by wire, in violation of 18 U.S.C. § 1344, multiple acts of interstate transportation of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 2314, and multiple acts of laundering of funds stolen from Plaintiffs, in violation of 18 U.S.C. §§ 1956 and 1957.

298.   ICS intentionally participated in and furthered the operations of the Association enterprise through, among other acts, multiple acts of fraud perpetrated against Plaintiffs through communications and transactions effected by wire, in violation of 18 U.S.C. § 1344, multiple

acts of interstate transportation of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 2314, and multiple acts of laundering of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 1956 and 1957.

299.   CNB intentionally participated in and furthered the operations of the Association enterprise thorough, among other acts, multiple acts of fraud perpetrated on Plaintiffs through transactions effected by wire, in violation of 18 U.S.C. § 1344, multiple acts of interstate transportation of funds stolen from Plaintiffs, in violation of 18 U.S.C. § 2314, and multiple acts of laundering of funds stolen from Plaintiffs, in violation of 18 U.S.C. §§ 1956 and 1957.

300.   The predicate acts of wire fraud, interstate transportation of stolen property, and money laundering by Williams, by Spiegelman, by ICS, and by CNB, constitute a pattern of unlawful racketeering activity by each of these defendants, within the meaning of 18 U.S.C. § 1961(1)(B), connected to the racketeering acts by each of the other defendants named herein, as part of a scheme to accomplish the common purposes of fraudulent extraction of funds from Plaintiffs, and concealment of their scheme.

301.   Each of the Plaintiffs suffered injury to its property and to its business, within the meaning of 18 U.S.C. § 1964(c) by reason of Williams', Spiegelman's, ICS's and CNB's violations of 18 U.S.C. §1962(c), in an amount to be determined by the trier of fact, for which amount trebled said defendants are jointly and severally liable, along with attorneys' fees, interest and costs.

TWENTY-SEVENTH CLAIM
Plaintiffs Against the RICO Defendants
RICO – Violation of 18 U.S.C. § 1962(d)

302.   Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, and 286 through 301, as if set forth herein.

303. At times alleged in this Complaint, each of the RICO Defendants was an associate of the NBUF enterprise, and conspired, within the meaning of 18 U.S.C. § 1962(d), with the other RICO Defendants to violate 18 U.S.C. § 1962(c). The RICO Defendants agreed and intended to participate in the affairs of the NBUF enterprise through a pattern of racketeering activity, by furthering or facilitating an endeavor of the NBUF enterprise that, when completed, would satisfy all the elements of the criminal offense, to wit, multiple and repeated acts of wire fraud, in violation of 18 U.S.C. § 1344, multiple and repeated acts of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314, and multiple and repeated acts of money laundering, in violation of 18 U.S.C. §§ 156 and 1957.

304. With knowledge that the NBUF enterprise engaged in multiple and repeated violations of the aforesaid statutes, the RICO Defendants agreed to facilitate acts of other associates of the NBUF enterprise that were necessary to further the scheme to fraudulent extract funds from Plaintiffs, and to conceal that scheme.

305. Each of the Plaintiffs suffered injury to its property and to its business, within the meaning of 18 U.S.C. § 1964(c) by reason of the RICO Defendants' violations of 18 U.S.C. §1962(d), in an amount to be determined by the trier of fact, for which amount trebled the RICO Defendants are jointly and severally liable, along with attorneys' fees, interest and costs.

TWENTY-EIGHTH CLAIM
Plaintiffs Against All of the RICO Defendants
RICO – Violation of 18 U.S.C. § 1962(d)

306. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, and 286 through 301, as if set forth herein.

307. At times alleged in this Complaint, each of the RICO Defendants was an associate of the Association enterprise, and conspired, within the meaning of 18 U.S.C. § 1962(d), with the

other RICO Defendants to violate 18 U.S.C. § 1962(c). The RICO Defendants agreed and intended to participate in the affairs of the Association enterprise through a pattern of racketeering activity, by furthering or facilitating an endeavor of the Association enterprise that, when completed, would satisfy all the elements of the criminal offense, to wit, multiple and repeated acts of wire fraud, in violation of 18 U.S.C. § 1344, multiple and repeated acts of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314, and multiple and repeated acts of money laundering, in violation of 18 U.S.C. §§ 156 and 1957.

308.    With knowledge that the Association enterprise engaged in multiple and repeated violations of the aforesaid statutes, the RICO Defendants agreed to facilitate acts of other associates of the Association enterprise that were necessary to further the scheme to fraudulent extract funds from Plaintiffs, and to conceal that scheme.

309.    Each of the Plaintiffs suffered injury to its property and to its business, within the meaning of 18 U.S.C. § 1964(c) by reason of the RICO Defendants' violations of 18 U.S.C. §1962(d), in an amount to be determined by the trier of fact, trebled, for which amount trebled d the RICO Defendants are jointly and severally liable, along with attorneys' fees, interest and costs.

### TWENTY-NINTH CLAIM
Penguin Against Spiegeleman, Williams, ICS and CNB
BREACH OF FIDUCIARY DUTY

310.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

311.    Defendant Spiegeleman owed fiduciary duties to Penguin, as its attorney and as trustee of its funds.

312.    By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegelman violated his fiduciary duties to Penguin.

313.    As a result of Defendant Spiegelman's breaches of fiduciary duty, Penguin has been damaged in an amount, to be determined by the trier of fact, not less than $3,335,393.90, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

THIRTIETH CLAIM
HTA Against Spiegelman, Williams, ICS and CNB
BREACH OF FIDUCIARY DUTY

314.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

315.    Defendant Spiegelman owed fiduciary duties to HTA, as its attorney and as trustee of its funds.

316.    By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegelman violated his fiduciary duties to HTA.

317.    As a result of Defendant Spiegelman's breaches of fiduciary duty, HTA has been damaged in an amount, to be determined by the trier of fact, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

THIRTY-FIRST CLAIM
CFH Against Spiegelman, Williams, ICS and CNB
BREACH OF FIDUCIARY DUTY

318.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

70

319.  Defendant Spiegelman owed fiduciary duties to CFH, as its attorney and as trustee of its funds.

320.  By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegleman violated his fiduciary duties to CFH.

321.  As a result of Defendant Spiegelman's breaches of fiduciary duty, CFH has been damaged in an amount, to be determined by the trier of fact, not less than $3,000,000.00, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

THIRTY-SECOND CLAIM
Ambassador Against Spiegelman, Williams, ICS and CNB
BREACH OF FIDUCIARY DUTY

322.  Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

323.  Defendant Spiegelman owed fiduciary duties to Ambassador, as its attorney and as trustee of its funds.

324.  By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegleman violated his fiduciary duties to Ambassador.

325.  As a result of Defendant Spiegelman's breaches of fiduciary duty, Ambassador has been damaged in an amount, to be determined by the trier of fact, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

### THIRTY-THIRD CLAIM
### RWB Against Spiegelman, Williams, ICS and CNB
### BREACH OF FIDUCIARY DUTY

326. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

327. Defendant Spiegelman owed fiduciary duties to RWB, as its attorney and as trustee of its funds.

328. By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegleman violated his fiduciary duties to RWB.

329. As a result of Defendant Spiegelman's breaches of fiduciary duty, RWB has been damaged in an amount, to be determined by the trier of fact, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

### THIRTY-FOURTH CLAIM
### 64 Against Spiegelman, Williams, ICS and CNB
### BREACH OF FIDUCIARY DUTY

330. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

331. Defendant Spiegelman owed fiduciary duties to 64, as its attorney and as trustee of its funds.

332. By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegleman violated his fiduciary duties to 64.

333. As a result of Defendant Spiegelman's breaches of fiduciary duty, 64 has been damaged in an amount, to be determined by the trier of fact, not less than $660,000.00, for which

Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

### THIRTY-FIFTH CLAIM
Bdlak Against Spiegelman, Williams, ICS and CNB
BREACH OF FIDUCIARY DUTY

334.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

335.    Defendant Spiegelman owed fiduciary duties to Bdlak, as its attorney and as trustee of its funds.

336.    By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegelman violated his fiduciary duties to Bdlak.

337.    As a result of Defendant Spiegelman's breaches of fiduciary duty, Bdlak has been damaged in an amount, to be determined by the trier of fact, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

### THIRTY-SIXTH CLAIM
Shpitz Against Spiegelman, Williams, ICS and Williams
BREACH OF FIDUCIARY DUTY

338.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

339.    Defendant Spiegelman owed fiduciary duties to Shpitz, as its attorney and as trustee of its funds.

340.    By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegleman violated his fiduciary duties to Shpitz.

341.    As a result of Defendant Spiegelman's breaches of fiduciary duty, Shpitz has been damaged in an amount, to be determined by the trier of fact, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

### THIRTY-SEVENTH CLAIM
2000 Against Spiegelman, Williams, ICS and CNB
BREACH OF FIDUCIARY DUTY

342.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

343.    Defendant Spiegelman owed fiduciary duties to 2000, as its attorney and as trustee of its funds.

344.    By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB,  Defendant Spiegleman violated his fiduciary duties to 2000.

345.    As a result of Defendant Spiegelman's breaches of fiduciary duty, 2000 has been damaged in an amount, to be determined by the trier of fact, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

### THIRTY-EIGHTH CLAIM
Jacov Against Spiegelman, Williams, ICS and CNB
BREACH OF FIDUCIARY DUTY

346.    Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

347.    Defendant Spiegelman owed fiduciary duties to Jacov, as his attorney and as trustee of his funds.

348. By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegelman violated his fiduciary duties to Jacov.

349. As a result of Defendant Spiegelman's breaches of fiduciary duty, Jacov has been damaged in an amount, to be determined by the trier of fact, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

THIRTY-NINTH CLAIM
Glattman Against Spiegelman, Williams, ICS and CNB
BREACH OF FIDUCIARY DUTY

350. Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 203, as if set forth herein.

351. Defendant Spiegelman owed fiduciary duties to Glattman, as his attorney and as trustee of his funds.

352. By reason of the foregoing, aided and abetted by Defendants Williams, ICS and CNB, Defendant Spiegelman violated his fiduciary duties to Glattman.

353. As a result of Defendant Spiegelman's breaches of fiduciary duty, Glattman has been damaged in an amount, to be determined by the trier of fact, not less than $1,500,000.00, for which Spiegelman, Williams, ICS and CNB are jointly and severally liable, along with punitive damages, attorneys' fees, interest and costs.

FORTIETH CLAIM
Penguin Against City of New York
Mandatory Injunction Directing Delivery of 29 Buildings Deeds

354. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 203, as if fully set forth herein.

355. Penguin has been damaged by the failure of the City of New York to deliver to it the 29 Buildings Deeds.

356. In the event it is determined that the 29 Buildings Contracts and the 29 Buildings Deeds are not forgeries, Penguin requests that the Court: (i) declare that Penguin has fully performed all of its obligations under the 29 Buildings Contracts and all conditions to release of the 29 Buildings Deeds have been satisfied; (ii) direct the City of New York to deliver to it the 29 Buildings Deeds, in recordable form; and (iii) award Penguin damages resulting from the failure of the City of New York to deliver the 29 Buildings timely, along with interest and costs.

WHEREFORE, Plaintiffs requests a trial by jury and requests judgment as follows:

1. On the First Claim, awarding Penguin damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, not less than $3,335,393.90, along with punitive damages, attorneys' fees, interest and costs.

2. On the Second Claim, awarding HTA damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

3. On the Third Claim, awarding CFH damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, not less than $3,000,000.00, along with punitive damages, attorneys' fees, interest and costs.

4. On the Fourth Claim, awarding Ambassador damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

5.     On the Fifth Claim, awarding RWB damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

6.     On the Sixth Claim, awarding 64 damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, not less than $660,000.00, along with punitive damages, attorneys' fees, interest and costs.

7.     On the Seventh Claim, awarding Bdlak damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

8.     On the Eighth Claim, awarding Shpitz damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

9.     On the Ninth Claim, awarding 2000 damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

10.     On the Tenth Claim, awarding Jacov damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees and costs.

11.     On the Eleventh Claim, awarding Glattman damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, not less than $1,500,000.00, along with punitive damages, attorneys' fees and costs.

12.     On the Twelfth Claim, awarding HTA damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

13.     On the Thirteenth Claim, awarding CFH damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

14.     On the Fourteenth Claim, awarding Ambassador damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

15.     On the Fifteenth Claim, awarding RWB damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs..

16.     On the Sixteenth Claim, awarding Bdlak damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

17.     On the Seventeenth Claim, awarding Shpitz damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

18.     On the Eighteenth Claim, awarding 2000 damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

19.    On the Nineteenth Claim, awarding Jacov damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees and costs.

20.    On the Twentieth Claim, awarding Glattman damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, not less than $1,500,000.00, along with punitive damages, attorneys' fees and costs.

21.    On the Twenty-First Claim, awarding Penguin damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, not less than $3,335,393.90, along with punitive damages, attorneys' fees and costs.

22.    On the Twenty-Second Claim, awarding Ambassador damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, not less than $1,025,450.00, along with punitive damages, attorneys' fees and costs.

23.    On the Twenty-Third Claim, awarding RWB damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, not less than $57,000.00, along with punitive damages, attorneys' fees and costs.

24.    On the Twenty-Fourth Claim, awarding Glattman damages against the RICO Defendants, jointly and severally, in an amount to be determined by the trier of fact, not less than $1,082,450.00, along with punitive damages, attorneys' fees and costs.

25.    On the Twenty-Fifth Claim, awarding each of the Plaintiffs damages against Williams, Spiegelman, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, trebled, along with attorneys' fees, interest and costs.

26.   On the Twenty-Sixth Claim, awarding each of the Plaintiffs damages against Williams, Spiegelman, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, trebled, along with attorneys' fees, interest and costs.

27.   On the Twenty-Seventh Claim, awarding each of the Plaintiffs damages against the RICO Defendants, except the City of New York, jointly and severally, in an amount to be determined by the trier of fact, trebled, along with attorneys' fees, interest and costs.

28.   On the Twenty-Eighth Claim, awarding each of the Plaintiffs damages against the RICO Defendants, except the City of New York, jointly and severally, in an amount to be determined by the trier of fact, trebled, along with attorneys' fees, interest and costs.

29.   On the Twenty-Ninth Claim, awarding Penguin damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, not less than $3,335,393.90, along with punitive damages, attorneys' fees, interest and costs.

30.   On the Thirtieth Claim, awarding HTA damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

31.   On the Thirty-First Claim, awarding CFH damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, not less than $3,000,000.00, along with punitive damages, attorneys' fees, interest and costs.

32.   On the Thirty-Second Claim, awarding Ambassador damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

33.     On the Thirty-Third Claim, awarding RWB damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

34.     On the Thirty-Fourth Claim, awarding 64 damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

35.     On the Thirty-Fifth Claim, awarding Bdlak damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

36.     On the Thirty-Sixth Claim, awarding Shpitz damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

37.     On the Thirty-Seventh Claim, awarding 2000 damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

38.     On the Thirty-Eighth Claim, awarding Jacov damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, along with punitive damages, attorneys' fees, interest and costs.

39.     On the Thirty-Ninth Claim, awarding Glattman damages against Defendants Spiegelman, Williams, ICS and CNB, jointly and severally, in an amount to be determined by the trier of fact, not less than $1,500,000.00, along with punitive damages, attorneys' fees, interest and costs.

40.    On the Fortieth Claim, declaring Penguin performed all of its obligations under the 29 Buildings Contract and all conditions to release of the 29 Buildings Deeds have been satisfied, directing the City of New York to deliver to Penguin Deeds to the 29 Buildings, in recordable form, and awarding Penguin damages against the City of New York in an amount to be determined by the trier of fact, along with interest and costs.

Dated: December 31, 2012

GORDON & HAFFNER, LLP
Attorneys for Plaintiffs

By: David Gordon, Esq.
480 Mamaroneck Avenue
Harrison, New York 10528
(914) 381-4848